Kenneth HARMS and Myrna Harms, Husband and Wife, Appellees,

v.

The CITY OF SIBLEY, A Municipal Corp., Appellant,

and

Joe's Ready Mix, Inc., An Iowa Corp., and Arlon Sandbulte, Appellants,

Joe's Ready Mix, Inc. and Arlon Sandbulte, Appellants,

v.

The City Of Sibley, Appellee.

No. 03–0728.

Supreme Court of Iowa.

Aug. 12, 2005.

G. Daniel Gildemeister of Gildemeister & Keane, L.L.P., Sioux City, for appellant City of Sibley.

Bradley K. De Jong and Michael J. Jacobsma of Klay, Veldhuizen, Bindner, De Jong & Jacobsma, P.L.C., Orange City, for appellees Kenneth Harms and Myrna Harms.

Lloyd W. Bierma of Oostra & Bierma, P.L.C., Sioux Center, for appellants Joe's Ready Mix, Inc. and Arlon Sandbulte.

LAVORATO, Chief Justice.

In this inverse condemnation and nuisance case, we consider two issues. First, did the City of Sibley (City) take the property of Kenneth and Myrna Harms (Harms) without the payment of just compensation in violation of federal and state constitutional provisions when the City rezoned property to allow the construction and operation of a ready mix plant in close proximity to the Harms' property? Second, does substantial evidence support a finding that Arlon Sandbulte (Sandbulte), owner of the property on which the ready mix plant was constructed, is personally liable to the Harms for a nuisance created by Joe's Ready Mix, Inc. (Joe's Ready Mix) even though he leased the property and plant to Joe's Ready Mix?

Contrary to the district court's decision but in accord with the court of appeals decision, we conclude that the City did not take the Harms' property in violation of federal and state constitutional provisions. We also conclude the court of appeals cor-

rectly decided that substantial evidence supports the district court's finding that Sandbulte is personally liable for the nuisance. Accordingly, we affirm the decision of the court of appeals and affirm in part and reverse in part the judgment of the district court.

## I. Background Facts.

**A. The layout of the properties.** An understanding of the layout of the properties involved in this litigation puts this dispute in context. County Road A–22 is the dividing line between the Harms' property and Joe's Ready Mix. The Harms live to the north of County Road A–22, and Joe's Ready Mix sits to the south of it. A 201–foot buffer exists between the plant and County Road A–22. Highway 60 is the closest road to the east of the Harms' property, and it is about one-half mile away. Olive Avenue borders Joe's Ready Mix and the Harms' property to the west. Olive Avenue is blacktop north of County Road A–22 (past the Harms' property) and gravel south of County Road A–22 (past Joe's Ready Mix). The Harms do not live within the city limits of Sibley, but the site of Joe's Ready Mix is within the city limits.

**B. Undisputed facts.** The parties agree the following facts are undisputed. In approximately September of 2000, representatives of Joe's Ready Mix, of Sioux Center, Iowa, approached the City to propose building a ready mix plant in Sibley on a parcel of land that was zoned "light industrial" (LI). An application for a building permit was reviewed by the zoning administrator and was denied. The zoning administrator concluded that the property would have to be zoned "heavy industrial" (HI) to accommodate the request. The owner appealed to the board of adjustment, and that appeal was unsuccessful.

On December 26, 2000, the city planning and zoning commission met to consider a request by the owner of the land, Sandbulte, to rezone the property to HI. The commission recommended rezoning.

A written protest was filed with the Sibley city clerk and was signed by the owners of twenty percent or more of the property located within 200 feet of the exterior boundaries of the property sought to be rezoned. The city attorney, interpreting Iowa Code section 414.5 (1999), concluded that a "super majority" (three-fourths) vote of the city council was required to accomplish rezoning.

A city council meeting was held January 31, 2001. At that meeting, the vote was three to two in favor of rezoning. The city attorney explained that the motion had been defeated. At the same time, the city attorney stated that the developer had submitted a new request for changing the zoning to HI. The planning and zoning commission recommended approval of that request on the same day.

The second request to rezone differed from the first request in that the property sought to be rezoned was more than 200 feet from the property line of the Harms, the parties who filed the written protest. The new property sought to be rezoned HI was 201 feet from the center of the road dividing the Harms' property from the property to be rezoned.

After proper notices of a public hearing to be held on February 20, 2001, the city council heard presentations from concerned citizens and accepted a petition from the Harms' attorney against rezoning. At that time, the council voted three to two in favor of rezoning. This meant the ordinance was adopted because a super majority vote for rezoning was no longer required.

## II. Proceedings.

On April 23, 2001, the Harms and Gary John Boor sued the City. Count I of the petition sought a declaratory ruling that the ordinance rezoning Sandbulte's property from LI to HI was invalid because it was arbitrary, unreasonable, and discriminatory. Count II was an inverse condemnation claim. In this count, the plaintiffs alleged that the ordinance constituted an unconstitutional taking of private property for public use without just compensation under the federal and state constitutions and sought damages because of the taking. Count III sought a declaratory ruling that the ordinance constituted a nuisance and sought injunctive relief enjoining the City from issuing any building permits for the construction and operation of heavy industrial buildings.

On April 27, 2001, Sandbulte, as owner of the rezoned property, applied for a building permit for construction of a concrete plant on the rezoned property. On May 2 Sandbulte applied for a building permit for construction of a bulk cement storage silo on the rezoned property. The zoning administrator issued the requested permits on May 4 and May 22, respectively.

Meanwhile, the plaintiffs amended their petition on May 11 to include Joe's Ready Mix, Inc. as a defendant and to add an additional count that sought a temporary restraining order enjoining Joe's Ready Mix from constructing and operating a heavy industrial ready mix plant.

Following a hearing, the district court denied the plaintiffs' request for a temporary restraining order. The court did so on two grounds: First, the plaintiffs had an adequate remedy at law because they could have filed a certiorari action challenging the validity of the ordinance, an action the plaintiffs failed to pursue. Second, the plaintiffs failed to name the real party in interest—Sandbulte—the one who applied for the building permits.

Thereafter, the City and Joe's Ready Mix filed motions for summary judgment. In the meantime, the plaintiffs amended their petition pursuant to court order to include Sandbulte as a defendant. In addition, the district court allowed the plaintiffs to amend their petition to allege a count against Sandbulte enjoining him from "any heavy industrial operations on" the rezoned property. The amended petition also requested that Sandbulte compensate the plaintiffs "for their loss in connection with the operation of the heavy industrial plant."

Joe's Ready Mix and Sandbulte then filed for indemnification against the City in the event the plaintiffs recovered against them.

Eventually, the district court denied the motions for summary judgment filed by the City and Joe's Ready Mix. Thereafter the district court allowed the plaintiffs to file a third amended petition, which added a count for nuisance against Sandbulte. The amended petition also sought punitive damages against Joe's Ready Mix and Sandbulte.

The parties tried the case to the court. Before trial, Boor filed a voluntary dismissal without prejudice.

At the time of trial on August 1, 2002, the Harms had lived on their property for thirty-seven years. Testimony revealed that the Harms' home was "quite well cared for." Appraisers offered their opinions on the value of the Harms' property as is and as if Joe's Ready Mix did not exist across the road.

Sandbulte is the president and a major shareholder of Joe's Ready Mix. He "oversee[s] all operations." Sandbulte owns the property upon which Joe's Ready Mix is

situated and leases the land to it. Sandbulte bought the property so he could put a ready mix plant on it.

Myrna Harms testified extensively about the noise, dust, and traffic problems since the plant began operations in November 2001. She also testified about the plant's bright lights that shine into her bedroom at night. Kenneth Harms also testified about the dust, noise, traffic, and lighting problems.

Following trial, the district court filed its findings of fact, conclusions of law, and judgment. The court adopted the agreement of undisputed facts recited earlier in this opinion and made additional findings of fact. The court found that the location of the ready mix plant resulted in damages to the Harms and diminution in their property value. The court, however, found that the Harms had failed to prove the rezoning ordinance was invalid.

As for the nuisance claim, the court found "that the interference [dust, noise, traffic congestion and increased truck traffic near the Harms' property] caused by the operation of the ready mix plant is intense and severe." The court concluded that "[u]nder these circumstances ... the operation of the ready mix plant is a nuisance and that the Harms are entitled to recover damages for a nuisance."

The court next considered the Harms' inverse condemnation claim. The court found and concluded as follows:

> [T]he operation of the plant involves a permanent physical invasion of Harms' property. The court finds that the only reasonable use of Harms' property is seriously affected by the change in the zoning ordinance and that Harms should be entitled to compensation from the City of Sibley. The court concludes that the actions of the City have resulted in a taking, entitling Harms to just compensation from the City. There has been a substantial diminution in the value of the Harms' property, sufficient to constitute a taking of property. The City, by changing the classification on the Sandbulte property, allowed Sandbulte and Joe's Ready Mix to create a nuisance, causing substantial damage to the Harms.

The court determined that an award of damages rather than injunctive relief was the appropriate relief for the nuisance. Because the court found the nuisance and the taking to be permanent, the court concluded the proper measure of damages for both the nuisance and the taking was the diminution in the market value of the Harms' property. The court also concluded the Harms were entitled to damages they suffered from deprivation of the comfortable enjoyment of their property.

The court awarded the Harms damages on the nuisance and taking claims for the diminution in value of their property in the amount of $43,750 and ordered that all the defendants were jointly and severally liable for that amount. The court also awarded the Harms $30,000 in special damages for the deprivation of the comfortable enjoyment of their home and ordered that Joe's Ready Mix and Sandbulte be jointly and severally liable to the Harms for that amount. The court denied the Harms' claim for punitive damages.

The court dismissed the claim for indemnification that Joe's Ready Mix and Sandbulte made against the City.

The City appealed; Joe's Ready Mix and Sandbulte cross-appealed. The City contended that the district court erred in finding that the evidence was sufficient to establish that the City's action in rezoning the property in question constituted a taking of the Harms' property without just compensation.

Joe's Ready Mix and Sandbulte contended that the district court erred in finding that (1) they took the Harms' property by inverse condemnation, and (2) Sandbulte created and maintained a nuisance. These defendants also contended that there was not substantial evidence that (1) Joe's Ready Mix created a nuisance, and (2) there was a permanent, physical invasion of the Harms' property. In addition, these defendants contended that the district court erred in awarding special damages to the Harms. Finally, these defendants contended that the district court abused its discretion by not allowing rebuttal evidence as to the light from Joe's Ready Mix plant that affected the Harms' property.

We transferred the case to the court of appeals, which affirmed the decision of the district court on all issues except one. That court concluded the City's action in rezoning the property in question did not constitute a taking of the Harms' property without just compensation. On this issue the court of appeals reversed. The dissent concluded otherwise. The majority opinion correctly determined that the district court had not found that Joe's Ready Mix and Sandbulte had committed a taking by inverse condemnation.

We granted the application for further review filed by Joe's Ready Mix and Sandbulte as well as the application for further review filed by the Harms.

### III. Issues.

We agree with the result the court of appeals reached on all the issues. However, we think two of the issues merit our attention. The first issue concerns the district court's conclusion that the City's action in rezoning the property in question constituted a taking of the Harms' property without just compensation. The second issue concerns the district court's conclu-

sion that Sandbulte was personally liable for the nuisance.

### IV. Scope of Review.

■ Review of a constitutional issue is de novo. *Gacke v. Pork Xtra, L.L.C.,* 684 N.W.2d 168, 172 (Iowa 2004).

■ With respect to Sandbulte's personal liability for the nuisance, we review the record for substantial evidence in support of the district court's findings. *See Henning v. Sec. Bank,* 564 N.W.2d 398, 399 (Iowa 1997) (stating that in a case tried at law, the district court's findings are binding on appeal if supported by substantial evidence). "Evidence is substantial if reasonable minds would accept it as adequate to reach the same findings." *Id.*

### V. The Takings Issue.

The Harms contend, as the district court found, that the City is liable on the theory of inverse condemnation for taking their property without just compensation in violation of the Fifth and Fourteenth Amendments to the Federal Constitution and article I, section 18 of the Iowa Constitution. In support of this contention, the Harms argue that the City's action in rezoning the property allowed the construction and the operation of the ready mix plant that resulted in a permanent physical invasion in the form of a nuisance, which directly affected their use and enjoyment of their property.

The Fifth Amendment to the Federal Constitution pertinently provides that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." The Fourteenth Amendment to the Federal Constitution prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Four-

teenth Amendment makes the Fifth Amendment applicable to the states and their political subdivisions. *Chicago, Burlington, & Quincy R.R. v. City of Chicago,* 166 U.S. 226, 234–35, 17 S.Ct. 581, 584, 41 L.Ed. 979, 983–84 (1897).

Article 1, section 9 of the Iowa Constitution pertinently provides that "no person shall be deprived of life, liberty, or property, without due process of law." Article 1, section 18 of the Iowa Constitution provides:

**Eminent domain—drainage ditches and levees.** Private property shall not be taken for public use without just compensation first being made, or secured to be made to the owner thereof, as soon as the damages shall be assessed by a jury. . . .

▮ Because the federal and state constitutional provisions regarding takings are nearly identical, federal cases interpreting the federal provision are persuasive in our interpretation of the state provision. *Cf., e.g., State v. Carter,* 696 N.W.2d 31, 37 (Iowa 2005) (federal and state search-and-seizure clauses); *Estate of Harris v. Papa John's Pizza,* 679 N.W.2d 673, 677–78 (Iowa 2004) (Title VII and the Iowa Civil Rights Act); *Norton v. Adair County,* 441 N.W.2d 347, 351 (Iowa 1989) (federal Labor Management Relations Act and Iowa Public Employment Relations Act). However, such cases are not binding on this court regarding our interpretation of the state provision. *See Carter,* 696 N.W.2d at 37; *see also Santi v. Santi,* 633 N.W.2d 312, 317 (Iowa 2001) (federal and state substantive due process). Because the Harms have not asserted and "we have not found a basis to distinguish the protections afforded by the Iowa Constitution from those afforded by the Federal Constitution under the facts of this case, our analysis applies equally to both the state and federal grounds." *Id.*

One writer describes inverse condemnation this way:

Inverse condemnation is simply a generic description applicable to all actions in which a property owner, in the absence of a formal condemnation proceeding, seeks to recover from a governmental entity for the appropriation of his property interest.

2A Julius L. Sackman, *Nichols on Eminent Domain* § 6.03[2], at 6–182 (rev.3d ed.2004) [hereinafter *Nichols* ]; *see also Iowa Coal Mining Co. v. Monroe County,* 555 N.W.2d 418, 431 (Iowa 1996). This procedure "is generally the appropriate procedural remedy for a landowner to challenge an allegedly confiscatory zoning ordinance." 2A Sackman, *Nichols* § 6.03[3], at 6–186.

Recently, the United States Supreme Court traced its Takings Clause jurisprudence in *Lingle v. Chevron U.S.A. Inc.,* — U.S. —, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). Early constitutional theorists believed the Takings Clause reached only a direct appropriation of property and did not reach regulations of property at all. *Lingle,* — U.S. at —, 125 S.Ct. at 2081, 161 L.Ed.2d at —. Beginning with *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the Court "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster-and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle,* — U.S. at —, 125 S.Ct. at 2081, 161 L.Ed.2d at —. The Court further recognized that " 'while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.' " *Id.* at —, 125 S.Ct. at 2081, 161 L.Ed.2d at — (quoting *Pa. Coal Co.,* 260 U.S. at 415, 43 S.Ct. at 160, 67 L.Ed. at 326).

In *Lingle*, the Court noted that the difficult question is in discerning when government regulation goes too far. *Id.* at ——, 125 S.Ct. at 2081, 161 L.Ed.2d at ——. In resolving that question, the Court reminds us that " 'government regulation—by definition—involves the adjustment of rights for the public good' and that 'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.' " *Id.* at ——, 125 S.Ct. at 2081, 161 L.Ed.2d at —— (citations omitted).

■ The Court further noted that its precedents "stake out two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes." *Id.* at ——, 125 S.Ct. at 2081, 161 L.Ed.2d at ——. The first category occurs when "government requires an owner to suffer a permanent physical invasion of her property-however minor." *Id.* at ——, 125 S.Ct. at 2081, 161 L.Ed.2d at ——. In that situation, government "must provide just compensation." *Id.* at ——, 125 S.Ct. at 2081, 161 L.Ed.2d at ——. It is this category that the district court found embraced the circumstances of this case.

■ The second category "applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Id.* at ——, 125 S.Ct. at 2081, 161 L.Ed.2d at —— (alteration in original) (citation omitted). As to this category, "the government must pay just compensation for such 'total regulatory takings,' except to the extent that 'background principles of nuisance and property law' independently restrict the owner's intended use of the property." *Id.* at ——, 125 S.Ct. at 2081, 161 L.Ed.2d at —— (citation omitted).

Outside of these two categories, the Court in *Lingle* cited the following factors set out in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) that govern regulatory takings challenges: (1) " '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations[,]' " and (2) "the 'character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.' " *Id.* at ——, 125 S.Ct. at 2081–82, 161 L.Ed.2d at —— (first alteration in original) (citations omitted).

Finally, the Court in *Lingle* disavowed the long-standing regulatory takings test that the "application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests." *Id.* at ——, 125 S.Ct. at 2082–83, 161 L.Ed.2d at ——. The Court explained that this test is really one concerned with due process and therefore "has no proper place in our takings jurisprudence." *Id.* at ——, 125 S.Ct. at 2083, 161 L.Ed.2d at ——. The "substantially advances" inquiry, the Court explained,

reveals nothing about the *magnitude or character of the burden* a particular regulation imposes upon private property rights. Nor does it provide any information about how any regulatory burden is *distributed* among property owners. In consequence, this test does not help to identify those regulations whose effects are functionally comparable to government appropriation or invasion of private property; it is tethered neither to the text of the Takings Clause nor to the basic justification for allowing regu-

latory actions to be challenged under the Clause.

*Id.* at ——, 125 S.Ct. at 2084, 161 L.Ed.2d at ——.

As this discussion in *Lingle* makes clear, an important factor in the takings analysis is whether the particular regulation under attack—here the rezoning ordinance—constitutes *government action* for purposes of the Takings Clause. *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 488, 107 S.Ct. 1232, 1243, 94 L.Ed.2d 472, 490 (1987) ("Many cases before and since *Pennsylvania Coal* have recognized that the nature of the State's action is critical in takings analysis."). Relevant to our analysis, *Griggs v. County of Allegheny,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), provides guidance.

In *Griggs,* a property owner sued Allegheny County for an alleged appropriation of his property resulting from take-off and landing of aircraft at the county airport. 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585. The county, pursuant to the National Airport Plan provided for by federal statute, executed three agreements with the Administrator of the Civil Aeronautics Administration (C.A.A.) in which it agreed, among other things, to abide by and adhere to the rules and regulations of the C.A.A. and to maintain a master plan of the airport, including approach areas. *Id.* at 85–86, 82 S.Ct. at 532, 7 L.Ed.2d at 586–87. The Administrator was responsible for providing approach standards for the county to follow, and the county agreed to acquire such easements or other interests in lands and air space as may be necessary. *Id.* at 86, 82 S.Ct. at 532, 7 L.Ed.2d at 587. The county submitted a master plan that included the approach areas, which the Administrator approved. *Id.* One such approach passed over the plaintiff's property. *Id.*

The uncontroverted facts in *Griggs* were summarized this way:

"Regular and almost continuous daily flights, often several minutes apart, have been made by a number of airlines directly over and very, very close to plaintiff's residence. During these flights it was often impossible for people in the house to converse or to talk on the telephone. The plaintiff and the members of his household . . . were frequently unable to sleep even with ear plugs and sleeping pills; . . . their health was affected and impaired, and they sometimes were compelled to sleep elsewhere."

*Id.* at 87, 82 S.Ct. at 533, 7 L.Ed.2d at 588 (citation omitted).

The question before the United States Supreme Court in *Griggs* was whether the county had taken an easement over the plaintiff's property that required just compensation. *Id.* at 84–85, 82 S.Ct. at 531, 7 L.Ed.2d at 586. The Court began its analysis with *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), which, the Court noted, "held that the United States by low flights of its military planes over a chicken farm made the property unusable for that purpose and [for that reason] there had been a 'taking', in the constitutional sense, of an air easement for which compensation must be made." *Griggs,* 369 U.S. at 88, 82 S.Ct. at 533, 7 L.Ed.2d at 588.

The Court in *Griggs* held that under the uncontroverted facts there indeed was a taking of an air easement over the plaintiff's property. However, the county, which had designed the airport for public use in conformity with the rules and regulations of the C.A.A., and not the C.A.A. or airlines using the airport, was liable to the property owner. *Id.* at 89–90, 82 S.Ct. at 533–34, 7 L.Ed.2d at 589. In reaching this conclusion, the Court reasoned:

It is argued that though there was a "taking," someone other than [the county] was the taker—the airlines or the C.A.A. acting as an authorized representative of the United States. We think, however, that [the county], which was the promoter, owner, and lessor of the airport, was in these circumstances the one who took the air easement in the constitutional sense. [The county] decided, subject to the approval of the C.A.A., where the airport would be built, what runways it would need, their direction and length, and what land and navigation easements would be needed. The Federal Government takes nothing; it is the local authority which decides to build an airport *vel non*, and where it is to be located. We see no difference between its responsibility for the air easements necessary for operation of the airport and its responsibility for the land on which the runways were built. Nor did the Congress when it designed the legislation for a National Airport Plan.

*Id.* at 89, 82 S.Ct. at 533–34, 7 L.Ed.2d at 589 (footnote omitted); *see also Barbian v. Panagis*, 694 F.2d 476, 485–87 (7th Cir. 1982) (holding that city's decision to rezone strip of land in residential area to enable large trucks to access warehouse and decision to grant variance from municipal noise ordinance did not constitute "taking" of abutting residential landowners' property that would entitle landowners to compensation where landowners' home bordered industrial area).

■ Without directly saying so, the Court in *Griggs* was employing a consequential damages rule when it rejected the argument that the C.A.A. was the taker rather than the county. The consequential damages rule provides that "in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair

its use, are universally held not to be a taking within the meaning of the constitutional provision." *N. Transp. Co. of Ohio v. City of Chicago*, 99 U.S. 635, 642, 25 L.Ed. 336, 338 (1878); *see also Barbian*, 694 F.2d at 486 n. 8; *Hansen v. United States*, 65 Fed.Cl. 76, 102–06 (2005) (recognizing that takings jurisprudence relies on general tort concepts such as causation to evaluate liability and holding that for a taking to be cognizable, causation, "that is a direct, as opposed to an indirect or consequential, appropriation or seizure of property," must be shown; "test simply requires proof that the government is the cause-in-fact of the harm for a taking to occur"). Our cases recognize this principle. *See, e.g., Higgins v. Bd. of Supervisors*, 188 Iowa 448, 455–58, 176 N.W. 268, 270–72 (1920) (recognizing and applying consequential damages rule and holding that the purchaser of land abutting on a meandered lake, which the executive council previously determined would be in the public interest to drain, pursuant to statute, had no vested interest in, or private right to, the waters of the lake, and no right to damages because of its drainage).

■ In contrast, when a burden is imposed upon an owner's land by the government's own property, that action constitutes government action resulting in a taking requiring just compensation. *See, e.g., Causby*, 328 U.S. at 265–68, 66 S.Ct. at 1068–69, 90 L.Ed. at 1212–14 (holding that Fifth Amendment required payment of compensation where noise produced from airplanes landing at and departing from government-operated airports and passing over plaintiffs' property constituted direct and immediate interference with the use of their property); *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 328–30, 43 S.Ct. 135, 136–37, 67 L.Ed. 287, 289–90 (1922) (holding that Fifth Amendment required the

United States to compensate a resort owner when the periodic firing of artillery shells over his property from a neighboring military base destroyed his business).

■ We think the consequential damages rule applies here. The Harms do not challenge the district court's finding that the rezoning ordinance was valid. Joe's Ready Mix and Sandbulte, as the county in *Griggs,* were the promoter and owner of the ready mix plant and decided, subject to the ordinance, where the plant was to be built and how it would be operated. The City in enacting the rezoning ordinance has taken no action in determining those matters.

Unlike *Causby* and *Portsmouth Harbor,* it was not the operation and maintenance of government property that produced the nuisance which caused the Harms' injury and damages. Under these circumstances, the City's action in rezoning the property did not result in a taking of an easement created by the nuisance as the Harms contend. Rather it was the action of Joe's Ready Mix and Sandbulte that produced the nuisance and they—rather than the City—should pay for the easement. To be sure, that is exactly what will happen as a result of the district court's damage award.

The Takings Clause " 'is designed not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.' " *Lingle,* —— U.S. at ——, 125 S.Ct. at 2080, 161 L.Ed.2d at —— (citation omitted). The Takings Clause's role is to bar " 'Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Id.* at ——, 125 S.Ct. at 2080, 161 L.Ed.2d at —— (citations omitted). Requiring Joe's Ready Mix and Sandbulte, rather than the City, to pay for the easement that Joe's Ready

Mix's and Sandbulte's actions have imposed upon the Harms' property is not inconsistent with this reasoning.

If we were to hold the City responsible under the circumstances of this case, there would be no end to the potential for liability every time there was a zoning change. As the Court in *Lingle* made clear, when any court attempts to determine when government regulation goes too far that court must be mindful that " 'government regulation-by definition-involves the adjustment of rights for the public good' and that 'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.' " *Lingle,* —— U.S. at ——, 125 S.Ct. at 2081, 161 L.Ed.2d at —— (citations omitted).

The Harms' and district court's heavy reliance on *Bormann v. Board of Supervisors,* 584 N.W.2d 309 (Iowa 1998) is misplaced. In that case, a statute granted nuisance immunity to " '[a] farm or farm operation located in an agricultural area.' " *Bormann,* 584 N.W.2d at 314 (quoting Iowa Code § 352.11(1)($a$) (1993)). We held the nuisance immunity created an easement in property affected by a nuisance in favor of land belonging to those seeking the agricultural designation. *Id.* at 316. This was because the immunity allowed those seeking the agricultural area designation to do acts (generate offensive smells on their property that affected the plaintiffs' use and enjoyment of their property) on their own land which, were it not for the easement, would constitute a nuisance. *Id.* Easements, we said, are property interests subject to the just compensation requirements of the Federal Takings Clause. *Id.* We held the statute unconstitutional because it authorized the use of property in such a way as to infringe on the rights of others by allowing the creation of a nuisance-easement with-

out the payment of just compensation. *Id.* at 321.

The government action in *Bormann* was *direct:* the legislature itself granted the easement in question without the payment of just compensation. Such action is akin to the government action declared to be a taking in *Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) and *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In *Nollan,* the Supreme Court held that the California Coastal Commission could not, without paying just compensation, condition grant of permission to rebuild a house on the property owners' transfer to the public of an easement across beachfront property. 483 U.S. at 827, 841–42, 107 S.Ct. at 3143, 3151, 97 L.Ed.2d at 683, 692. In *Loretto,* a state statute provided that a landlord must permit a cable television company to install its cable facilities on the landlord's property. 458 U.S. at 421, 102 S.Ct. at 3168, 73 L.Ed.2d at 873. The Court held that government action in the form of this statute resulted in a physical occupation of the landlord's property and for that reason was a taking. *Id.*

No similar direct action was involved in the rezoning here. Moreover, if we had held in *Bormann* that the statute was constitutional, the plaintiffs would have received *no* compensation for the easement. Here, however, compensation has been awarded to the Harms by way of the damage award against Joe's Ready Mix and Sandbulte.

The Harms' and district court's reliance on *Perkins v. Board of Supervisors,* 636 N.W.2d 58 (Iowa 2001) is likewise misplaced, but for a different reason. In *Perkins,* Madison County enacted an amendment exempting fairground property from its zoning ordinance during the five days of the county fair. 636 N.W.2d at 62. As part of our takings analysis, we recognized that "our takings jurisprudence demands consideration of whether *government* action substantially interferes with an owner's use and enjoyment of his or her property." *Id.* at 70. As to whether the amendment constituted government action requiring just compensation, we said:

> The real action the property owners complain of is at the direction of the Association, not Madison County. In fact, Madison County in enacting the amendment has essentially taken no action in the matter of determining the activities to take place during the fair. Given these facts, it is possible to conclude that such exemption of the fairgrounds from the Ordinance cannot constitute state action. *However, this ignores the reality of the actions of the local zoning board. Though on its face the amendment is not a racing law, the Board of Supervisors in enacting the amendment has effectively permitted the Association to conduct figure-eight racing. In doing so, the action of the Board of Supervisors constituted government action.*

*Id.* (emphasis added). We think the facts in *Perkins* are akin to the facts in *Griggs, Barbian,* and *Higgins.* And for that reason the board's action in amending the Madison County ordinance fell within the ambit of the consequential damages rule. The unitalicized portion of the above paragraph is consistent with this position. We could therefore have decided the takings issue on the basis that the board's action in amending the ordinance did not constitute government action.

We understand why the italicized part of the analysis gave the Harms and the district court a basis for concluding that the City's action here was likewise government action constituting a taking. Although our

government action analysis in *Perkins* is inconsistent with the position we now take, the ultimate conclusion we reached in *Perkins* that there was no *compensable* taking was correct.

## VI. Sandbulte's Liability for the Nuisance.

■ Sandbulte contends he cannot personally be liable for nuisance because he merely leased the property to Joe's Ready Mix and had minimal personal involvement. The general rule is that a landowner is not responsible for a tenant's acts in creating or maintaining a nuisance upon the leasehold after the landlord transfers possession to the tenant. *Klimkowski v. De La Torre*, 175 Ariz. 340, 857 P.2d 392, 394 (Ct.App.1993); *cf. Sulhoff v. Everett*, 235 Iowa 396, 399, 16 N.W.2d 737, 739 (1944) (stating "the landlord would be liable for injuries resulting from a defective construction at and before the tenancy began" and concluding verdict for defendant-owner was rightly directed when it was the tenant who created the nuisance). This is because "property law regards a lease as equivalent to a sale of the premises for the term of the lease, making the tenant both owner and occupier during the lease." *Klimkowski*, 857 P.2d at 394; *accord* Restatement (Second) of Torts § 356 cmt. *a.*, at 240 (1965) ("When land is leased to a tenant, the law of property regards the lease as equivalent to a sale of the land for the term of the lease. The lessee acquires an estate in the land, and becomes for the time being the owner and occupier, subject to all of the liabilities of one in possession, both to those who enter the land and to those outside of it."); *see also Van Essen v. McCormick Enters. Co.*, 599 N.W.2d 716, 721 n. 5 (Iowa 1999) (quoting in part Restatement (Second) of Torts § 356 cmt. *a.*, at 240 (1965)). Under this rationale, "a tenant's right to exclusive possession of the property suspends the landlord's right of entry, along with his ability to abate a nuisance on the property, during the term of the lease." *Klimkowski*, 857 P.2d at 394; *see also Van Essen*, 599 N.W.2d at 721.

■ Restatement (Second) of Torts section 837 (1979) provides an exception to this rule. Like the court of appeals, we think this Restatement provision provides the basis for holding Sandbulte personally liable for the nuisance. Section 837 provides:

(1) A lessor of land is subject to liability for a nuisance caused by an activity carried on upon the land while the lease continues and the lessor continues as owner, if the lessor would be liable if he had carried on the activity himself, and

(a) at the time of the lease the lessor consents to the activity or knows or has reason to know that it will be carried on, and

(b) he then knows or should know that it will necessarily involve or is already causing the nuisance.

(2) A vendor of land is not liable for a nuisance caused solely by an activity carried on upon the land after he has transferred it.

Restatement (Second) of Torts § 837, at 152 (1979); *see also* 58 Am.Jur.2d *Nuisances* § 120, at 647 (2002) ("Under the Restatement Second of Torts, a lessor's liability is generally based on his or her consent to or knowledge of the nuisance.").

Although this is our first occasion to adopt section 837, we have in the past applied a related Restatement provision, Restatement (Second) of Torts § 834 (1979), in *Page County Appliance Center, Inc. v. Honeywell, Inc.*, 347 N.W.2d 171, 176 (Iowa 1984). Section 834 provides that "[o]ne is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he

participates to a substantial extent in carrying it on." Restatement (Second) of Torts § 834 (1979). Several other states have adopted section 837 or have found it to represent the state's view. *See, e.g., Klimkowski,* 857 P.2d at 394; *Stokes v. Lyddy,* 75 Conn.App. 252, 815 A.2d 263, 272–73 (2003); *Tex. Co. v. Sowers,* 258 S.W.2d 924, 925 (Ky.Ct.App.1953) (applying Restatement of Torts § 837, at 293 (1939)); *Parklawn, Inc. v. Nee,* 243 Md. 249, 220 A.2d 563, 566–67 (1966); *Koch v. Randall,* 136 N.H. 500, 618 A.2d 283, 285 (1992); *Walker v. L.G. Everist, Inc.,* 102 N.M. 783, 701 P.2d 382, 386–87 (Ct.App. 1985); *Commonwealth v. DeLoach,* 714 A.2d 483, 487 (Pa.Commw.Ct.1998); *Bowers v. Wurzburg,* 207 W.Va. 28, 528 S.E.2d 475, 480–82 (1999).

Here, as mentioned, substantial evidence supports the district court's finding that the operation of the ready mix plant constituted a nuisance. The evidence establishes that Sandbulte is the owner of the property upon which the ready mix plant is located and that he personally applied for the building permits for the plant. The evidence also establishes that at the time Sandbulte leased the property to Joe's Ready Mix, he knew activities of a ready mix plant would be carried on by Joe's Ready Mix, and he consented to those activities. In fact, he purchased the property intending to build a ready mix plant on it. The Harms' protests to the conditions that would be created by the plant were made known to Sandbulte before the rezoning and the construction of the plant. Moreover, Sandbulte has been president of Joe's Ready Mix for a number of years and oversees all operations. Joe's Ready Mix operates a number of other ready mix plants, so Sandbulte is well acquainted with the activities that take place at ready mix plants.

The following excerpt from the testimony of Sandbulte shows his ownership of the property upon which the plant is located, his development of and ownership in the plant itself, and his personal involvement in the property:

Q. It's my understanding that you proceeded to build that plant; is that correct? A. Yes, we did.

Q. And is that plant under lease? A. Yes. I leased it to Joe's Ready Mix. I own the property myself and I lease the—the ready mix plant to Joe's Ready Mix.

Q. And who maintains the operation of that plant? A. Joe's Ready Mix.

Q. And are you personally involved on your own behalf, not as president of Joe's, as far as that property is concerned? A. Yes.

Q. You have the development in the property; is that correct? A. Yes, yes.

Q. As far as the ongoing management, day-to-day operation, is that in Joe's Ready Mix? A. Yes, that's Joe's Ready Mix.

Moreover, invoices in evidence show that Sandbulte purchased the silo, conveyor, and tunnel conveyor used in the operation of the plant and paid for the building permits.

In sum, we think substantial evidence establishes all of the elements of section 837 of the Restatement of (Second) of Torts. For this reason, the district court as well as the court of appeals was correct in holding Sandbulte personally liable for the nuisance.

## VII. Disposition.

Having determined that the court of appeals reached the right result on all of the issues, we affirm its decision. We also affirm the district court decision except for one issue. We reverse that part of the

district court's decision that determined the City had taken the Harms' property without payment of just compensation in violation of federal and state constitutional provisions.

**DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.**