# IN THE SUPREME COURT OF IOWA

No. 63 / 04-1499

Filed June 2, 2006

**WAYNE J. TETZLAFF, BARBARA A.
TETZLAFF and BRIANA A. TETZLAFF,**

Appellants,

vs.

**TIMOTHY CAMP and GLENNA CAMP,**

Defendants,

**AL PANGBORN and RACHAEL PANGBORN,**

Appellees.

_____

Appeal from the Iowa District Court for Polk County, Glenn Pille, Judge.

Appellants contend on interlocutory appeal that district court's summary judgment decision finding lessors not liable for the nuisance activities of their tenants was in error. **REVERSED AND REMANDED.**

Brenda L. Myers-Maas, West Des Moines, for appellants.

Eldon L. McAfee of Beving, Swanson & Forrest, P.C., Des Moines, for appellees.

Paul Swinton of Morain, Burlingame & Pugh, P.L.C., West Des Moines, and Christina L. Gruenhagen, West Des Moines, for amici curiae.

**STREIT, Justice.**

With ownership of property comes responsibility. The plaintiffs, Wayne, Barbara, and Briana Tetzlaff (Tetzlaffs), rural homeowners, appeal from a summary judgment entered in favor of co-defendants Al and Rachael Pangborn (Pangborns), owners of adjacent property, on their nuisance claim. Tetzlaffs contend the district court erred in ruling as a matter of law that Pangborns could not be found liable for the other co-defendants', Tim and Glenna Camp (Camps), decision to spread manure on the Pangborn property. Because we find a landlord may be liable if he or she renews a lease with notice that the tenant's prior use resulted in a nuisance, we reverse the decision of the district court.

### I. Facts and Prior Proceedings

The three parties to this litigation are neighbors. Camps operate a three-hundred head hog finishing facility on land they own across the road from Tetzlaffs' acreage. Pangborns live on an acreage to the south of Tetzlaffs. Approximately ten acres of farmland (hereinafter the "south field") separates the Tetzlaff and Pangborn residences. In 1999, Pangborns bought approximately sixty-seven acres of farmland directly north of Tetzlaffs' acreage (hereinafter the "north field").

Camps hay the south field and plant row crops on the north field. There is no written tenancy agreement between Pangborns and Camps. Instead, there is a verbal, yet nearly unspoken "gentlemen's agreement." On a year-to-year basis, Camps farm the property and pay 50% of the cash proceeds from the harvested crops to Pangborns. Pangborns maintain grass paths around the north and south fields. They also drive their ATVs and snowmobiles over the grass paths, maintain deer stands in the north field, and hunt and allow others to hunt in the north field.

Camps routinely apply manure from their hog finishing facility on Pangborns' north and south fields and, at Pangborns' request, spread manure on Pangborns' personal garden. The hog manure is surface spread 90 feet from the south side of Tetzlaffs' home and 160 feet from the north side.

In October of 1999, a month before Pangborns purchased the north field, Tetzlaffs complained to Pangborns about Camps' manure spreading procedures on the south field. Despite these complaints, Pangborns purchased the north field and allowed Camp to spread manure there also. After Tetzlaffs' numerous complaints fell on deaf ears, they filed an action in 2003 against both Pangborns and Camps alleging negligence, nuisance, and nuisance under Iowa Code chapter 657 (2003).

Pangborns filed a motion for summary judgment contending they were not liable because they merely had a farm lease with Camps, the party controlling the nuisance activity. Tetzlaffs resisted the motion by arguing there was no lease, and even if there was a lease, Pangborns were still liable for allowing Camps to spread manure on the land. The district court concluded the "essential factual issue" determining Pangborns' liability was whether Pangborns substantially controlled or participated in the nuisance activity, "regardless of whether the case is analyzed through a landlord tenant-theory or independent contractor theory." The court concluded Pangborns did not substantially control or participate in the nuisance activity and therefore granted Pangborns' motion for summary judgment.

On interlocutory appeal, Tetzlaffs argue the district court erred in summarily dismissing Pangborns from the case.

## II. Scope of Review

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Keokuk Junction Ry. v. IES Indus., Inc.*, 618 N.W.2d 352, 355 (Iowa 2000). We view the evidence in the light most favorable to the non-moving party. *Id.* Every legitimate inference reasonably deduced from the evidence should be afforded the resisting party. *Farm Bureau Mut. Ins. Co. v. Milne*, 424 N.W.2d 422, 423 (Iowa 1988). Our review of a summary judgment ruling is for correction of errors of law. *Keokuk Junction Ry.*, 618 N.W.2d at 355.

This decision is limited to the question of whether the district court's decision to grant Pangborns' summary judgment motion was appropriate. Whether the manure spreading activities were or were not a nuisance is not an issue before this court.

## III. Error Preservation

As discussed below, we conclude the district court committed error when it concluded "[s]ubstantial control or participation is the essential factual issue that determines liability for the Pangborns in this dispute." However, before we proceed we must first address Pangborns' argument that Tetzlaffs failed to preserve a key issue for this appeal.

Pangborns contend the district court did not address whether a landlord can be liable for a nuisance caused by a tenant in possession. More importantly, Pangborns argue Tetzlaffs did not preserve this issue for our review because they never filed a 1.904 motion[1] asking the court to enlarge its findings. *See Meier v. Senecaut III*, 641 N.W.2d 532, 537

---

[1] A rule 1.904 motion is the proper method to ask the district court to enlarge or amend its findings of fact and conclusions of law when the district court failed to resolve an issue, claim, or other legal theory properly submitted for adjudication. *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 751 n.4 (Iowa 2006).

(Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."); Iowa R. Civ. P. 1.904(2). Because this argument was both raised and ruled upon by the district court, we find the issue was preserved for our review.

The motion for summary judgment focused on several issues. The dominant issue was whether a farm tenancy existed between Pangborns and Camps. Another issue was whether Pangborns were liable, even if there was a farm tenancy. Pangborns argued that Camps, as farm tenants in possession, were responsible for the farm ground and therefore Pangborns owed no duty of care to Tetzlaffs. In their memorandum of authorities supporting the motion for summary judgment, Pangborns stated:

> In order to prevail under a nuisance theory, [Tetzlaffs] must establish that Pangborns would be liable if they carried on the alleged nuisance causing activity themselves, and at the time of the leasing, that the Pangborns consented to the activity and knew that the activity would necessarily result in a nuisance. *See* Restatement (Second) of Torts § 837. . . . The Pangborns could not have known or anticipated that an activity such as fertilizer application on agricultural property in a rural Iowa county would, at some point in the future, necessarily result in a nuisance to neighbors living on an adjacent acreage that, at the time of leasing, did not yet exist. The law does not require a lessor to exhibit this degree of foresight. Therefore, [Tetzlaffs'] claim of nuisance against defendant Pangborns is void as a matter of law and should be dismissed.

While Tetzlaffs themselves did not specifically cite Restatement section 837 in their resistance to the summary judgment motion, they clearly addressed the issue of Pangborns' reliance on the Restatement in their memorandum of authorities:

> Iowa Courts have also found owners of land who allow others to create or maintain nuisance conditions on the owner's

land liable for the nuisance. *Percival v. Yousling*, 120 Iowa 451, 94 N.W. 913 (1903) (owner of land who allowed others to dump manure and other refuse on land liable for nuisance). . . . The court must go one step further and determine whether, even if there is a landlord-tenant relationship between [Pangborns and Camps], the Pangborns are liable for nuisance or negligence because of their involvement in creating and/or maintaining the nuisance complained of.

The court devoted the bulk of its decision to discussing whether Pangborns substantially controlled or participated in the nuisance activity. The court found Pangborns were not liable "regardless of whether the case is analyzed through a landlord tenant-theory or independent contractor theory" because Pangborns did not substantially control or participate in the manure spreading. A landlord's liability for the nuisance causing activities of his or her tenants was clearly argued to the court, and the court ruled upon this issue by concluding it was not an avenue for liability.

Tetzlaffs did not need to file a rule 1.904 motion to preserve this issue for appeal. When a district court *does not rule* on an issue properly raised, a party must file a motion requesting a ruling in order to preserve error for appeal. *Meier*, 641 N.W.2d at 539; *Benavides v. J.C. Penney Life Ins. Co.*, 539 N.W.2d 352, 356 (Iowa 1995). We require such a motion because it is "in the best interests of the public, and especially the litigants" to give the court an opportunity to address an issue it may have missed. *Estate of Grossman v. McCreary*, 373 N.W.2d 113, 114 (Iowa 1985). Also, an "overlooked issue, called to the trial court's attention, might be resolved so as to avoid an appeal" or "a ruling on [the overlooked issue] might avert a second trial and possible appeal." *Id.* In this case, the court summarily resolved the issue—Pangborns were not liable under a landlord/tenant theory. Tetzlaffs correctly concluded it

was not necessary to belabor the point with a rule 1.904 motion asking the court to reconsider its decision on the issue.

### IV. Merits

Property law regards a lease as equivalent to a sale of the premises for the term of the lease, making the tenant both owner and occupier during the lease. *Harms v. City of Sibley*, 702 N.W.2d 91, 103 (Iowa 2005); *accord* Restatement (Second) of Torts § 356 cmt. *a*, at 240 (1965) ("When land is leased to a tenant, the law of property regards the lease as equivalent to a sale of the land for the term of the lease. The lessee acquires an estate in the land, and becomes for the time being the owner and occupier, subject to all of the liabilities of one in possession, both to those who enter the land and to those outside of it."); *see also Van Essen v. McCormick Enters. Co.*, 599 N.W.2d 716, 721 n.5 (Iowa 1999) (quoting in part Restatement (Second) of Torts § 356 cmt. *a*, at 240 (1965)). Because the tenant has exclusive possession of the property, and the right of entry of the landlord is suspended during the term of the lease, the landlord's responsibility for removing objectionable conditions is likewise suspended. *Harms*, 702 N.W.2d at 103. Therefore, the landowner is generally not responsible for the tenant's acts in creating or maintaining a nuisance upon the leasehold once the landlord transfers possession to the tenant. *Id.*

Recently, we discussed one important exception to this general rule. In *Harms v. Sibley*, we were presented with a landowner who found himself on the wrong end of a nuisance action against his tenants. *Id.* at 96. The landowner, Sandbulte, leased property to Joe's Ready Mix, Inc. *Id.* at 104. Joe's Ready Mix constructed and operated a ready mix plant on the property. *Id.* A neighboring landowner sued both Joe's Ready Mix and Sandbulte for nuisance. *Id.* at 94. The district court found

Sandbulte liable for the nuisance. *Id.* at 95. On appeal, Sandbulte argued he was not personally liable because he "merely leased the property to Joe's Ready Mix and had minimal personal involvement." *Id.* at 103. Rather than analyzing whether Sandbulte was liable for participating, to a substantial extent, in carrying on the nuisance activity, we applied section 837 of the Restatement Second of Torts and affirmed the district court judgment. *See id.* at 103-04 (citing other jurisdictions applying same). Section 837 provides:

> (1) A lessor of land is subject to liability for a nuisance caused by an activity carried on upon the land while the lease continues and the lessor continues as owner, if the lessor would be liable if he had carried on the activity himself, and
>
>     (*a*) at the time of the lease the lessor consents to the activity or knows or has reason to know that it will be carried on, and
>
>     (*b*) he then knows or should know that it will necessarily involve or is already causing the nuisance.
>
> (2) A vendor of land is not liable for a nuisance caused solely by an activity carried on upon the land after he has transferred it.

*See also* 58 Am. Jur. 2d *Nuisances* § 120, at 647 (2002) ("Under the Restatement Second of Torts, a lessor's liability is generally based on his or her consent to or knowledge of the nuisance.").

We found the following facts constituted "substantial evidence" to support all of the elements of section 837. *Harms,* 702 N.W.2d at 104. First, at the time Sandbulte leased the property to Joe's Ready Mix, Sandbulte knew that Joe's Ready Mix planned to operate a ready mix plant on the property and knew the types of activities that would be performed within the plant. *Id.* Also, Sandbulte was aware of the plaintiff's protests about the proposed conditions before the plant was

even constructed. *Id.* And finally, Sandbulte was, at some point, the president of Joe's Ready Mix and oversaw all operation of the plant. *Id.* Section 837 does not require that the lessor work, or participate in the nuisance activity, but Sandbulte's role as president illustrates he knew the lessee's activities and understood the externalities that flowed therefrom.

The facts of the present case, viewed most favorably for the Tetzlaffs, similarly demonstrate Pangborns, as lessors, may be liable for the alleged nuisance caused by their tenants.

The first element of section 837(1)—"the lessor would be liable if he had carried on the activity himself"—is not in dispute. Pangborns would be liable if they had caused a nuisance by personally spreading manure on the north and south fields. *See Michael v. Michael*, 461 N.W.2d 334 (Iowa 1990) (holding that spreading hog manure near neighboring residents can be a nuisance for which injunctive relief may be awarded); *Valasek v. Baer*, 401 N.W.2d 33 (Iowa 1987) (holding same). Likewise, if Pangborns had allowed others, without a lease, to spread manure on their property, they would also have potential liability. *See Percival*, 120 Iowa at 455, 94 N.W. at 914-15 (holding owner of land liable for nuisance for allowing others to dump horse manure in a ravine on his property).

The second element of section 837(1)—"at the time of the lease the lessor consents to the activity or knows or has reason to know that it will be carried on"—is also satisfied by Al Pangborn's statement that he assumed Camps would spread manure on the north field, just as they had done on the south field.

Pangborns vigorously dispute whether the record satisfies the third element of section 837(1)—that Pangborns knew or should have known that Camps' activities would *necessarily* involve a nuisance or was

already causing the nuisance. Pangborns contend they could not have known or anticipated that manure spreading on agricultural property in a rural area would, at some point in the future, *necessarily* result in a nuisance. They contend the law should not require a lessor to exhibit this degree of foresight. This argument ignores the stage of proceedings and the facts of this case.

Tetzlaffs complained to Pangborns about Camps' surface spreading of manure on the south field and Pangborns' personal garden *before* Pangborns even purchased the north field. Common sense would indicate that more of the same activity, in an area adjacent to Tetzlaffs' property, would exacerbate Tetzlaffs' complaints. Beyond this initial complaint, Tetzlaffs also complained to Camps, the Madison County Sheriff, and the Department of Natural Resources[2] about the manure spreading activities after the "gentlemen's agreement" was formed, but *before* at least one of its subsequent renewals.[3] Pangborns were alerted to the continuing complaints in early 2000 when a third party spoke individually with Rachael Pangborn about Tetzlaffs' complaints. In 2002, the Madison County Sheriff spoke with Al Pangborn about Tetzlaffs' complaints. In his notes regarding the conversation, the sheriff indicated Al Pangborn agreed the manure spreading was probably very offensive to the Tetzlaff family. Tetzlaffs' complaints to Pangborns, along with

---

[2]The Department of Natural Resources' conclusions that Camps' manure spreading procedures were not in violation of existing regulations does not terminate Tetzlaffs' nuisance complaint. A business operated within government guidelines may still, under some circumstances and in some locations, constitute a private nuisance. *See, e.g.*, *Kriener v. Turkey Valley Comm. Sch. Dist.*, 212 N.W.2d 526, 535 (Iowa 1973); *Patz v. Farmegg Prods., Inc.*, 196 N.W.2d 557, 561 (Iowa 1972).

[3]Although the exact date of the "gentleman's agreement" was not known, it was formed at some point between the fall of 1999 and March 1, 2000. The agreement would have therefore been renewed on approximately March 1, 2001, March 1, 2002, and March 1, 2003. This action was filed in early April, 2003.

Pangborns' discussions with the sheriff about such complaints, create a permissible inference that Pangborns knew the manure spreading was interfering with Tetzlaffs' property rights. Pangborns' subjective conclusion that Tetzlaffs' complaint had no merit does not mean he did not know of at least the potential for a nuisance action.

Comment *g* to section 837 also supports this conclusion. It provides:

> If at the time that the lessor renews the lease he knows that activities are being carried on or that physical conditions have been created upon the leased land that are causing an unreasonable interference with the use and enjoyment of another's land, he is liable for the continuance of the interference after the renewal.

Restatement (Second) of Torts § 837 cmt. *g,* at 153-54 (1979). As noted above, it is beyond dispute Pangborns were on notice that the manure spreading activity was "already causing [a] nuisance" when they renewed their lease with Camps. *See* Restatement (Second) of Torts § 837(1)(*b*) ("A lessor of land is subject to liability for a nuisance caused by an activity carried on upon the land while the lease continues and the lessor continues as owner, if . . . . [the lessor] knows or should know that [the activity] will necessarily involve or is already causing the nuisance."). Therefore, it is clear that, under section 837, Pangborns may be liable for the manure spreading activities of their tenants.[4]

---

[4]While there are no Iowa cases with facts similar to this case, at least one other court has found a lessor of agricultural land liable for nuisance for allowing a lessee to spread manure near neighboring residents. In *Koch v. Randall,* the parties owned properties adjacent to each other. 618 A.2d 283, 284 (N.H. 1992). Randall owned a home on a portion of his property and leased the remainder of his acreage to a co-defendant who farmed the fields and spread chicken manure thereon for fertilizer. *Id.* at 284-85. The New Hampshire Supreme Court held Randall, as lessor, was liable for nuisance because he knew his lessee used chicken manure to fertilize the fields and he had been put on prior notice of the nuisance when the plaintiff complained to county health officials who in turn relayed the complaints to Randall. *Id.* at 285-86.

The amici curiae, a conglomeration of farming-related associations, fear that holding Pangborns liable for the actions of their farmer tenants will negatively impact Iowa's economy because other landowners would then forbid their tenants from utilizing manure as a fertilizer. The amici hypothesize the rental price for farm land will "undoubtedly" fall, and the state's economy will necessarily suffer because a farmer interested in renting property for crop production will be less inclined to rent a piece of land when the landlord forbids fertilization of the land with manure application.[5]

We disagree. It is still the law of this state that a landlord is generally not responsible for the tenant's acts in creating or maintaining a nuisance upon the leasehold. Section 837 protects the landlord so long as he or she does not know, at the time of the lease, (1) that the activity will be carried on by the tenants and (2) that the activity involved will necessarily cause a nuisance. These are formidable barriers, but Pangborns' specific activities in this case generate enough of a factual dispute to preclude summary judgment. Pangborns knew of Camps' manure spreading activities and Tetzlaffs' corresponding complaints *before* the alleged farm tenancy was created. Pangborns also continued to renew Camps' lease (and thereby endorsed Camps' manure spreading procedures) despite Tetzlaffs' repeated complaints. It is also important that the initial "gentlemen's agreement" and the ensuing renewals placed no limitation on the method of manure application. Not surprisingly,

---

[5]In addition, the amici speculate farmers will lose an important outlet for the manure created by their livestock. They hypothesize that small livestock operations will be forced to cease operations because of the high cost of otherwise treating and disposing of manure. We reject the amici's attempt to have this case decide the hog lot debate in Iowa. To find that section 837 does not apply to farm tenancies would allow other rural landowners to rent their ground out as a manure disposal site, without any regard for the consequences to the neighbors. This is not an acceptable alternative.

Camps chose the quickest and cheapest method of manure application—surface spreading, where a plume of manure is broadcast only on the surface of the ground. As discussed in our previous decisions in *Michael v. Michael* and *Valasek v. Baer,* surface spreading hog manure leads to nauseating odors which may result in a nuisance to others. *Michael,* 461 N.W.2d at 335; *Valasek,* 401 N.W.2d at 35-37.

We do not hold that all rural landlords who allow manure spreading on their property are liable for nuisance. We merely find that this landlord's unique level of involvement with both the lessee and complaining neighbor generate enough factual issues to surmount the obstacles to landlord liability at this stage in the proceedings. Therefore summary judgment is not appropriate in this case.

**V. Disposition**

If a nuisance arises from the use of the premises during the period of the lease, the landlord likely does not have the power to abate that nuisance. However, at the expiration of the lease, the landlord, knowing that the potential nuisance exists, has the ability to stop the nuisance by not renewing the lease or by adding restrictive terms in the lease. If the landlord does not choose to do so, but renews the lease, then the landlord may be liable for the continuance of the interference after the renewal. We reverse the district court's grant of summary judgment in favor of Pangborns and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**