ZINTER, Justice
(concurring specially).
[¶ 27.] I concur in the Court’s opinion to the extent it suggests that Landowners initially had standing because they alleged SDCL 41-9-1.1(2) constituted a taking under the state and federal constitutions. I concur because, when standing is at issue in the early stages of litigation, “the focus is on the party seeking relief, not on the issues [presented, and] [w]e do not consider whether the party filing the challenge ‘will ultimately be entitled to any relief but whether he has the legal right to seek judicial redress for his grievance.’ ” Matter of Baby Boy K., 1996 SD 33, ¶ 14, 546 N.W.2d 86, 90 (internal citations omitted).
[¶ 28.] However, I disagree with the Court’s opinion to the extent it suggests that the causation element of standing was ultimately proven, ie., that Landowners’ “injury is fairly traceable to SDCL 41-9-1.1(2).” Supra ¶ 23. Although Landowners may be presumed to have satisfied this causation element of standing at the outset of the litigation, the United States Supreme Court has clearly explained that Landowners also bore the burden of proving the causation element of standing throughout all stages of the litigation. Lu-jan, 504 U.S. at 561, 112 S.Ct. at 2136, 119 L.Ed.2d at 364 (citations omitted).[2]
[¶ 29.] Furthermore, Landowners bore the burden of proving the causation requirement of standing “in the same way as any other matter on which the plaintiff bears the burden of proof, ie., with the manner and degree of evidence required at the successive stages of the litigation.” Id. *143 (citations omitted). Thus, the manner and degree of proof necessary for Landowners to sustain their standing burden changed from the outset when they alleged a takings claim to the final disposition when they were required to prove that claim:
At the pleading stage, general factual allegations of injury resulting from the defendant’s conduct may suffice, for on a motion to dismiss we “presum[e] that general allegations embrace those specific facts that are necessary to support the claim.” [Lujan v.] National Wildlife Federation, supra, 497 U.S. [871] at 889, 110 S.Ct. [3177] at 3189[, 111 L.Ed.2d 695 (1990)]. In response to a summary judgment motion, however, the plaintiff can no longer rest on such “mere allegations,” but must “set forth” by affidavit or other evidence “specific facts,” FedRule CivProc 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be “supported adequately by the evidence adduced at trial.” Gladstone, supra, 441 U.S. at 115, n. 31, 99 S.Ct. at 1616, n. 31.
Lujan, 504 U.S. at 561, 112 S.Ct. at 2137, 119 L.Ed.2d at 364-65. Therefore, the mere fact that Landowners may be presumed to have standing to plead and litigate their takings claim does not mean that they necessarily satisfied their burden of proving standing on the merits.
[¶ 30.] In this case, the causal connection element of standing is also a required element of Landowners’ takings claim. See supra ¶ 22 (citing Lujan, 504 U.S. at 560-61, 112 S.Ct. at 2136, 119 L.Ed.2d at 364), and infra ¶¶ 57-74, 83 (analyzing Landowners’ takings claim). Consequently, in order to maintain standing and prove their takings claim on the merits, Landowners were required to prove causation between the claimed injury (invasion of their property) and the conduct of which they complain (legislation decriminalizing certain types of hunting on public rights-of-way).
[¶ 31.] Landowners’ burden of proving this causal connection for standing is especially high in this case because they are challenging a regulation (or more properly, the non-regulation) of parties who are not before the Court, i.e., private individuals who engage in hunting on public rights-of-way. Landowners’ burden is especially high because, when an individual challenges the legality of government action or inaction, the extent of the burden of establishing the elements of standing will depend on whether the plaintiff is the object of the action or inaction. Lujan, 504 U.S. at 561-62, 112 S.Ct. at 2137, 119 L.Ed.2d at 365. If the plaintiff is the object of the government’s action or inaction, “there is ordinarily little question that the action or inaction has caused [the] injury, and that a judgment preventing or requiring the action will redress it.” Id. However, if the “plaintiffs asserted injury arises from the government’s allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed.” Id. at 562, 112 S.Ct. at 2137, 119 L.Ed.2d at 365.
In that circumstance, causation and re-dressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction — and perhaps on the response of others as well. The existence of one or more of the essential elements of standing “depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,” ... and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to pro *144 duce causation and permit redressability of injury.
Id. (internal citations omitted). Therefore, in cases like this where the statutes at issue regulate the criminality of hunting by private individuals, rather than the conduct .of plaintiff Landowners, “standing is not precluded, but it is ordinarily ‘substantially more difficult’ to establish.” Id. (emphasis added) (citations omitted).
[¶ 32.] In this case, Landowners failed to meet this difficult standing burden because, as the Court explains in Issue 3, the State’s passage of SDCL 41-9-1.1(2) was not the legal cause of Landowners’ injury. See infra ¶¶ 57-74, 83. SDCL 41-9-1.1(2) was not the legal cause of Landowners’ injury because the statute is nothing more than the definitional part of a criminal regimen regulating hunting by private individuals. The criminal nature of the regulation • is undeniable. SDCL 41-9-1 makes it a Class 2 misdemeanor to hunt “upon any private land not his own or in his possession without permission from the owner or lessee of such land.” And, SDCL 41-9-1.1(2), the statute Landowners challenge, simply defines the types of hunting on the rights-of-way that are and are not subject to the criminal proscription in SDCL 41-9-1. SDCL 41-9-1.1(2) provides in relevant part: “ § 41-9-1 [the criminal proscription] does not apply to ... [t]he shooting at or taking by legal methods of small game ... that are in flight over private land if the small game has either originated from or has taken flight from the highway or public right-of-way.”
[¶ 33.] The Court acknowledges the fact that this is a- criminal statute but contends that the State has “mischaracterize[d]” Landowners’ claim. Supra ¶ 20. I agree that the State cannot mischaracterize the nature of Landowners’ claim to defeat standing at the pleading stage. However, at the same time, Landowners cannot ignore the legal effect of SDCL 41-9-11(2) in satisfying their burden of proof regarding standing on the merits. The legal effect of this statute is that it defines the type of conduct that subjects individual hunters to a criminal prosecution. But, Landowners “lack[ ] a judicially cognizable interest in the prosecution or non-prosecution of another.” Linda R.S. v. Richard D., 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973). Because Landowners lack a judicially cognizable interest in the prosecution or non-prosecution of the individual hunters, Landowners cannot establish the causal connection necessary to maintain standing in the merits stage of this litigation. Id. (concluding that “given the special status of criminal prosecutions in our system,” a person has no standing to challenge the failure to prosecute another even though that person may suffer an injury due to the failure to prosecute).
[¶ 34.] The Court recognizes the causal connection requirement of Lujan and concludes that Landowners’ injury, the invasion of their property, is “fairly traceable” to this statute. See supra ¶¶ 22-23. However, the Court errs in this conclusion because it only cites a portion of the causation rule. The entire rule provides: “there must be a causal connection between the injury and the conduct complained of — the injury has to be ‘fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.’ ” Lujan, 504 U.S. at 560, 112 S.Ct. at 2136, 119 L.Ed.2d at 354 (emphasis added) (citation omitted). If the entire causation rule is acknowledged and applied, it is evident that Landowners failed to prove standing. They failed to prove standing because their injury is only caused when third party hunters, who are *145 not before the court, choose to shoot into Landowners’ airspace.
[¶ 35.] Because the third-party hunters are the legal cause of Landowners’ injury, Landowners have failed to meet their burden of proving standing on the merits.[3] Consequently, I decline to join that portion of the Court’s opinion broadly stating that Landowners’ injury was “fairly traceable” to the statute decriminalizing certain types of hunting in the rights-of-way.
[¶ 36.] GILBERTSON, Chief Justice, writing for the Court on Issue 3.
[¶ 37.] 3. Whether the circuit court erred when it held SDCL 11-9-1.1(2) constitutes a taking of Landowners’ property within the meaning of the Takings Clause of the Fifth Amendment of the United States Constitution, and article VI, section 13 of the South Dakota Constitution
[¶ 38.] Landowners brought this action seeking declaratory and injunctive relief against the State, GFP and certain state officials. Landowners challenge the constitutionality of SDCL 41-9-1.1(2), which decriminalizes the shooting of small game birds that have taken flight from or fly over a public right-of-way. The circuit court found SDCL 41-9-1.1(2) constitutes a taking without just compensation in violation of the Fifth Amendment of the United States Constitution and article VI, section 13 of the South Dakota Constitution. We reverse on Issue 3.
[¶ 39.] Statutory interpretation is an issue of law to be reviewed de novo. Block v. Drake, 2004 SD 72, ¶ 8, 681 N.W.2d 460, 463 (citing Steinberg v. South Dakota Dept. of Military Affairs, 2000 SD 36, ¶ 6, 607 N.W.2d 596, 599). An appeal asserting an infringement of a constitutional right is also an issue of law to be reviewed under the de novo standard of review. State v. Dillon, 2001 SD 97, ¶ 12, 632 N.W.2d 37, 43 (citing State v. Stanga, 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488). Under the de novo standard of review, we give no deference to the circuit court’s conclusions of law. Sherburn v. Patterson Farms, Inc., 1999 SD 47, ¶ 4, 593 N.W.2d 414, 416 (citing City of Colton v. Schwebach, 1997 SD 4, ¶ 8, 557 N.W.2d 769, 771).
[¶ 40.] Challenges to the constitutionality of a statute face a significant and heavy burden. Meinders v. Weber, 2000 SD 2, ¶ 10, 604 N.W.2d 248, 254 (quoting Sedlacek v. South Dakota Teener Baseball Program, 437 N.W.2d 866, 868 (S.D.1989) (quoting Oien v. City of Sioux Falls, 393 N.W.2d 286, 289 (S.D.1986))). There is a strong presumption that a statute is constitutional. State v. Asmussen, 2003 SD 102, ¶ 2, 668 N.W.2d 725, 728 (citing State v. Allison, 2000 SD 21, ¶ 5, 607 N.W.2d 1, 2). “In order to prevail, a successful challenge must refute this presumption beyond a reasonable doubt.” Id. (citing State v. McGill, 536 N.W.2d 89, 94 (S.D.1995)). “If a statute can be construed so as not to violate the constitution, that construction must be adopted.” Wegleitner v. Sattler, 1998 SD 88, ¶ 4, 582 N.W.2d 688, 689 (quoting Cary v. City of Rapid City, 1997 SD 18, ¶ 10, 559 N.W.2d 891, 893 (citing Simpson v. Tobin, 367 N.W.2d 757, 766 (S.D.1985))).
[¶ 41.] The Takings Clause of the Fifth Amendment provides in relevant part: “nor shall private property be taken for public use, without just compensation.” US Const, amend V. It is applicable to the states through the Due Process Clause of the Fourteenth Amendment. Lingle v. Chevron USA Inc., 544 U.S. 528, -, 125 *146 S.Ct. 2074, 2080, 161 L.Ed.2d 876 (2005) (citing Chicago, B. & Q.R. Co. v. Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897)). Article VI, section 13 of the South Dakota Constitution provides: “Private property shall not be taken for public use, or damaged,[4] without just compensation, which will be determined according to legal procedure established by the Legislature and according to § 6 of this article.”
[¶ 42.] The issue of what constitutes a “public use” has been a subject of frequent litigation. Recently in Kelo v. City of New London, — U.S. -, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), the United States Supreme Court concluded that á taking from one private party that will ultimately go to another private party complies with this Standard as long as “it embraced ... the broader and more natural interpretation' of public use as ‘public purpose.’ ” Id. at 2657. However, the Court recognized that the states were free “to impose ‘public use’ requirements that are stricter than the federal baseline.” Id. at 2668. South Dakota has consistently done so. In its interpretation of article VI, section 13, this Court adopted the “use by the public test.” Illinois Central R.R. Co. v. East Sioux Falls Quarry Co., 33 S.D. 63, 144 N.W. 724 (1913). This definition requires that there be a “use or right of use on the part of the public or some limited portion of it[.]” Id. at 77, 144 N.W. at 728. In that case, we did consider the alternate “public benefit” rule but opted for the “use by the public” rule. Id.
The reasons which incline us-to this view are, first, that it accords with the primary and more, commonly understood meaning of the words; second, it accords with the general practice in regard to taking private property for public use in vogue when the phrase was first brought into use in the earlier Constitutions; third, it is the only view which gives the words any force as a limitation or renders them capable of any definite and practical application.'
Id. at 78,144 N.W. at 728. Thus, our state constitution provides its landowners more protection against á taking of their property than the United States Constitution. Cf. State v. Opperman, 247 N.W.2d 673, 674 (S.D.1976) (citing Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975)) (holding that the South Dakota Supreme Court has the power to interpret our state constitution as providing an individual with greater protection than the Federal Constitution) (footnote omitted). The “use by the public” standard continues to be the law of this jurisdiction. See Great Northern Ry. Co. v. Chicago, St. P., M. & O. Ry. Co., 78 S.D. 168, 175-176, 99 N.W.2d 439, 443 (1959); Frawley Ranches, Inc. v. Lasher, 270 N.W.2d 366, 369 (S.D.1978).
[¶ 43.]Examination of this constitutional issue cannot be conducted in a historical *147 vacuum. In a concurrence in Reis v. Miller, 1996 SD 75, ¶¶ 28-31, 550 N.W.2d at 84-85, (Gilbertson, J., concurring), a portion of the history of South Dakota hunting laws was set forth:
Historically, there is no support for the contention of the Plaintiffs that the Territorial Legislature in 1870, when accepting the rights-of-way easement from the Federal Government by enacting what is now SDCL 31-18-1, somehow intended to limit or preclude hunting from these ribbons of real estate. During the Territorial period, no limitations can be found on hunting anywhere although I presume that a landowner could maintain an action for trespass for entering on his land without his permission. See Clark v. Bates, 1 Dakota 42, 46 N.W. 510 (1874), aff'd, 95 U.S. 204, 24 L.Ed. 471 (1877). However, acts committed within the section line were not held to be a trespass upon the adjoining landowner’s real property. State v. Bonine, 41 S.D. 231, 170 N.W. 138 (1918). As to wild game specifically, it was not until 1899 that the South Dakota Legislature passed its first limitation on hunting anywhere in the State, by requiring the owners’ permission to hunt on private land. See SDCL 41-9-1.
At common law, wild game was deemed to be the property of the sovereign or state and not of the private real property owner. State v. Pollock, 42 S.D. 360, 365, 175 N.W. 557, 558 (1919). Therein we stated:
This power of the state is based largely on the circumstance that the property right to the wild game within its borders is vested in the people of the state in their sovereign capacity; and as an exercise of its police powers and to protect its property for the benefit of its citizens, it is not only the right, but it is the duty of the state to take such steps as shall preserve the game from the greed of hunters.... The right to kill the game is a boon or privilege granted either expressly or impliedly by the sovereign authority and is not a right inhering in any individual....
42 S.D. at 365-66, 175 N.W. at 559 (quoting 12 RCL 685). This common law doctrine was reinforced in 1899 by the passage of what is now SDCL 41 — 1— 2, which provides in part, that “any game bird, game animal, or game fish ... shall always and under all circumstances be and remain the property of the state.... ” Eighty-two years were to go by until the Legislature sought to limit hunting within certain rights-of-way simply because of that realty’s status by the amendment of SDCL 41-9-1.1 to that effect. State v. Peters, 334 N.W.2d 217, 221 (S.D.1983). Prior to that time, the only applicable statutory hunting restrictions in existence were those generally pertaining to hunting such as bag limits or for the protections of farm buildings, fields and schools. See SDC 1939, § 25.0427.
[¶ 44.] Although the law concerning hunting regulation upon private property rather than public rights-of-way has been evolving since the commencement of regulation in 1899, it is a fair summary that for the most part, it has been an evolution from no regulation commencing at statehood in 1889 to that of increasing regulation and criminal restrictions upon hunters to protect private landowners.[5] The chal *148 lenged amendments to SDCL 41-9-1.1(2) are not consistent with that trend.
[¶ 45.] SDCL 41-9-1.1(2) provides in relevant part:
The shooting at or taking by legal methods of small game, except mourning dove, that are in flight over private land if the small game has either originated from or has taken flight from the highway or public right-of-way or if the small game is in the process of flying over the highway or public right-of-way.
If subdivision (2) of this section is declared by an advisory opinion or adjudication of 'the South Dakota Supreme Court to be a taking of private property requiring compensation, subdivision (2) is void.
The object of SDCL 41-9-1.1(2) is to define what constitutes criminal versus noncriminal conduct when hunting on rights-of-way section lines or highways. SDCL 41-9-1.1(2) does not seek to impose a limitation on the conduct of landowners or on the use of their property. Therefore, we must analyze the facts as brought forth by the Landowners in order to determine if the actions of the hunters who act in compliance with SDCL 41-9-1.1(2) and the 2003 GFP Hunting Handbook result in a taking within the meaning of the Fifth Amendment Takings Clause and article VI, section 13 takings jurisprudence, as was concluded by the circuit court.[6]
*149 [¶ 46.] The purpose of the Takings Clause under the Fifth Amendment is not to prohibit all governmental takings or interference with private property, but rather to require compensation be paid by the government “in the event of otherwise proper interference amounting to a taking.” Lingle, 544 U.S. at -, 125 S.Ct. at 2080, 161 L.Ed.2d 876 (quoting First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 315, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1987)). A plaintiff seeking redress against the government under a regulatory takings claim must proceed under one of four theories: plaintiff must allege either 1) a per se regulatory physical taking under Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), “where government requires an owner to suffer a permanent physical invasion of her property”; 2) a per se total regulatory taking under Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), that deprives an owner of “all economically beneficial uses of the property”; 3) a regulatory taking under Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), when a temporary or partial taking is alleged; or 4) a land-use exaction violating the standards as set forth in Nollan v. California Coastal Comm’n., 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), and Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). Lingle, 544 U.S. at -, 125 S.Ct. at 2081-82, 2086-87, 161 L.Ed.2d 876.
[¶ 47.] Landowners argue a per se regulatory physical taking was effectuated by the passage of SDCL 41-9-1.1(2), as the conduct permitted under the statute and as described by the 2003 GFP Hunting Handbook has resulted in a permanent physical invasion of their property. In the alternative, Landowners argue that if this Court finds no per se regulatory physical taking, there was a partial or temporary regulatory taking under Penn Central that unreasonably interfered with their distinct investment-backed expectations and background principles of South Dakota property law. The State contends that neither a per se regulatory physical taking nor a Penn Central regulatory taking has occurred, but rather the conduct in question has merely been decriminalized. Landowners do not argue a per se total regulatory taking under Lucas. Nor is the land-use exaction theory under Nollan and Do-lan applicable to the instant case.

A. Per Se Regulatory Physical Taking

[¶48.] A permanent physical occupation or an appropriation by the government of private property is the most serious form of invasion into an owner’s property interests, and constitutes a per se regulatory physical taking. Loretto, 458 U.S. at 435, 102 S.Ct. at 3175-76, 73 *150 L.Ed.2d 868. A per se physical occupation occurs when the placement of a “fixed structure on land or real property” is effected by the government or by a third party under the government’s direction. Id. at 436-37, 102 S.Ct. at 3176-77, 73 L.Ed.2d 868.[7] A per se physical occupation may also occur when the airspace over land is invaded in such a manner as to prohibit the use of land for any purpose, thereby resulting in a complete loss to the landowner. United States v. Causby, 328 U.S. 256, 261, 66 S.Ct. 1062, 1065, 90 L.Ed. 1206 (1946) (holding airplane flights passing over land “by reason of frequency and altitude of the flights” can constitute a permanent physical occupation and a com-pensable taking within the meaning of the Fifth Amendment). However, there is a “constitutional distinction between a permanent physical occupation and a temporary physical invasion.” Loretto, 458 U.S. at 434, 102 S.Ct. at 3175, 73 L.Ed.2d 868. The first effects a compensable taking within the meaning of the Fifth Amendment, but the second does not. Id. A physical occupation that is less than permanent, and amounts to no more than a temporary physical invasion does not constitute a classic per se regulatory physical taking within the meaning of Loretto. Id. (citing PruneYard Shopping Center v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980)).
[¶ 49.] Landowners cite to Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922) (Portsmouth II), as support for their proposition that shots fired over private property constitute a permanent physical occupation and therefore a com-pensable taking. However, in that case the United States Supreme Court was called upon to determine if the facts as pleaded by the plaintiff were sufficient to withstand a demurrer, in present day terms a motion for judgment on the pleadings for failure to state a claim. Id. at 328, 43 S.Ct. at 136, 67 L.Ed. 287.
[¶ 50.] The facts as pleaded by the plaintiff in Portsmouth II and its companion cases included the mounting of a large battery of cannons “with the intention of firing them over the claimant’s land and without the intent or ability to fire them except over that land.”[8] Id. at 329, 43 S.Ct. at 136-37, 67 L.Ed. 287. In addition, the government had erected a fire control station that the Court noted could be evidence of intent to continue firing the cannons at will across claimant’s land. Id. The issue hinged, according to the Court’s rationale, on whether the firing of the cannons had the result of depriving the owner of the profitable use of the land. Id. at 329, 43 S.Ct. at 136, 67 L.Ed. 287. The Supreme Court held that there were sufficient facts-alleged by the claimant to reverse the lower court’s holding on the de *151 murrer. Id. at 330, 43 S.Ct. at 137, 67 L.Ed. 287. The Court noted, “[i]n our opinion the specific facts set forth would warrant a finding that a servitude has been imposed.” Id. While dicta, the Court’s comment was based on the specific facts of the case, including the fact that “the public has been frightened off the premises by the imminence of the” cannons thereby eliminating the value of the property as a summer resort, its main value to the owner.[9] Id. at 328, 43 S.Ct. at 136, 67 L.Ed. 287. However, the Supreme Court did not hold that such facts amounted to a taking, stating instead that the facts might support a finding of a taking, but that the issue was a question for the lower court to decide at trial. Id. at 330, 43 S.Ct. at 137, 67 L.Ed. 287.
[¶ 51.] In the instant case, there is no allegation that the firing of shot from a shotgun by hunters is threatened at any and all times, as the cannons fired by the government were in Portsmouth II. Nor have Landowners alleged a total deprivation of all potential profits due to the actions of the hunters who act in compliance with SDCL 41-9-1.1(2). The facts in the instant case are more analogous to the facts in Peabody, 231 U.S. 530, 34 S.Ct. 159, 58 L.Ed. 351, and Portsmouth I, 250 U.S. 1, 39 S.Ct. 399, 63 L.Ed. 809, where the Supreme Court concluded the facts were insufficient to demonstrate a permanent physical occupation.[10]
[¶ 52.] In the instant case, the hunters who engage in the conduct described in SDCL 41-9-1.1(2) may do so without risking prosecution for a criminal offense, but only during the small game bird hunting season. Only those who meet the requirements of the appropriate license, and have purchased one, come within the scope of this provision. Hunting regulations further limit the hours of shooting activity. Moreover, the shooting is only decriminalized if a bird of the types spéeified in the statute takes flight from or over the right-of-way and the hunter is located within the right-of-way.[11] Given the number of limit *152 ing factors that must be present in order for the act of shooting to meet the safe harbor conditions precluding criminal prosecution as provided in SDCL 41-9-1.1(2), the activity as described can occur on an intermittent basis only during the hunting season, and not at all during the other months of the year. Landowners themselves have indicated in their affidavits that the activity does not occur constantly throughout the hunting season. The conduct is therefore temporary in nature during the hunting season, or in the alternative, it is a criminal act outside the protection of the statute.
[¶ 53.] Next, Landowners attempt to characterize the shot left laying on their land as further evidence of a permanent occupation. However, the shot pellets that remain on the ground are not fixed structures placed on the land by the hunters or by the State, and therefore do not work a per se regulatory physical taking. See Loretto, 458 U.S. at 430, 102 S.Ct. at 3173, 73 L.Ed.2d 868 (noting fixed physical structures such as “telegraph and telephone lines, rails, and underground pipes or wires are takings even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner’s use of the rest of his land”). Nor do Landowners establish the shot that may remain prohibits the use of their land for any purpose so as to work a complete loss of its value. Lacking more than intermittent and temporary invasions, or the placement of a fixed structure upon the land by the State, or a complete loss of value of the property to Landowners, there is no legal basis to support a conclusion of law that the State’s act in passing SDCL 41-9-1.1(2) or the hunters’ actions of firing shot worked a per se regulatory physical taking within the meaning of the Fifth Amendment of the United States Constitution and article VI, section 13 of the South Dakota Constitution.

B. Penn Central Regulatory Taking

[¶ 54.] The acts of the hunters result in temporary and intermitted physical invasions rather than a permanent occupation. Therefore, we must analyze the takings claim under the Penn Central regulatory analysis. See Lingle, 544 U.S. at -, 125 S.Ct. at 2081-82, 161 L.Ed.2d 876.
[¶ 55.] Under the United States Supreme Court’s holding in Penn Central, three principal factors must be analyzed in order to determine whether a regulation goes so far as to effect a taking within the meaning of the Fifth Amendment. Id. at -, 125 S.Ct. at 2081-82, 161 L.Ed.2d 876. First, “the character of the governmental action” must be evaluated, keeping in mind that a
“taking” may more readily be found when the interference with property can be characterized as a physical invasion by government, see e.g., United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), than when interfer *153 ence arises from some public program adjusting the benefits and burdens of economic life to promote the common good.
Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d 631. Next, “the economic impact of the regulation on the claimant” must be examined. Lingle, 544 U.S. at -, 125 S.Ct. -at 2081-82, 161 L.Ed.2d 876. Finally, the extent to which the regulation has interfered with “distinct investment-backed expectations” must be analyzed. Id. When examining the economic impact and interference with distinct investment-backed expectations, we must do so by examining the alleged interferences with rights in the property as whole; Penn Central, 438 U.S. at 130-31, 98 S.Ct. at 2662, 57 L.Ed.2d 631.
[¶ 56.] Not every destruction or injury to private property by governmental regulation will be a taking within the meaning of the Fifth Amendment. Omnia Commercial Co. v. United States, 261 U.S. 502, 508-510, 43 S.Ct. 437, 438, 67 L.Ed. 773 (1923). “The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far -it will be recognized as a taking.” Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct, 158, 159, 67 L.Ed. 322 (1922). The difficulty lies in determining when damage to private property constitutes a compensable “taking,” such that justice requires that the burden imposed on the private property owners by the regulation be spread among taxpayers through the payment of compensation.

1. Character of the Governmental Action

[If -57.] The character and nature of the state’s action is critical in determining whether a taking has occurred. Keystone Bituminous Coal Ass’n. v. DeBenedictis, 480 U.S. 470, 488, 107 S.Ct. 1232, 1243, 94 L.Ed.2d 472 (1987); (citing Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322). A‘ distinction exists between the character of the government’s actions in situations involving a permanent physical occupation of property and a more temporary invasion or government action outside the owner’s property that causes consequential damages within; Loretto, 458 U.S. at 428, 102 S.Ct. at 3172, 73 L.Ed.2d 868.
[¶ 58.] When a regulatory taking is alleged, the éxamination of the character of the government action includes a determination of whether that action resulted in direct, as opposed to an indirect' or 'consequential, harm to the property. Hansen v. United States, 65 Fed.Cl. 76, 106 (FedCl 2005) (citing Ridge Line, Inc. v. United States, 346 F.3d 1346, 1355 (Fed.Cir.2003) (citing Portsmouth II, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287)). The causation requirement in Portsmouth II, is often referred to as the “natural, probable consequence test.” Id. (citing Ridge Line, 346 F.3d at 1355). The test requires proof that the government action is the cause-in-fact of the harm for a taking to be cognizable. Id. (citing Ridge Line, 346 F.3d at 1355).
[¶59.] This cause-in-fact concept'was examined in Griggs v. County of Allegheny, where homeowners were made physically ill and their home rendered uninhabitable by the noise and vibrations caused by the landings and takeoffs of airplanes at the Allegheny County airport. 369 U.S. at 84, 87, 82 S.Ct. at 531, 533, 7 L.Ed.2d 585. The airport flight path caused airplanes to travel within thirty to 300 feet over the residence on takeoffs, and between fifty-three and 153 feet during landings. Id. The county had constructed the airport in compliance with all regulations of the Civil Aeronautics Administration (CAA) that specified the length of airstrips *154 and the clearance required for landings and takeoffs. Id. at 85, 82 S.Ct. at 531, 7 L.Ed.2d 585. The county argued that if a taking had occurred it was effected by the federal government through the CAA’s regulations, as the airport was in compliance with those regulations. Id. at 89, 82 S.Ct. at 533-34, 7 L.Ed.2d 585. The Court held that the county could not shift the responsibility for the taking to the CAA, as the county had selected the site for the airport and had secured the required properties for the physical construction of runways. Id. The Court concluded that it was the actions of the county and not the regulations of the CAA that had worked the taking of an air easement over the homeowners’ property. Id. The Court noted:
The Federal Government takes nothing; it is the local authority which decides to build an airport vel non, and where it is to be located. We see no difference between its responsibility for the air easements necessary for operation of the airport and its responsibility for the land on which the runways were built.
Id. (emphasis added).
[¶ 60.] Similarly, in Harms v. City of Sibley, 702 N.W.2d 91 (Iowa 2005), the Iowa Supreme Court was called upon to determine if the City of Sibley’s rezoning ordinance had worked a taking of private property within the meaning of the Fifth Amendment. In that case, the city rezoned property across the street from the Harms’ home from “light industrial” to “heavy industrial” at the request of Joe’s Ready Mix. Id. at 93. The operation of the cement plant then created intense noise, dust and traffic problems, as well as caused lights to be shone into the Harms’ home at all hours of the night. Id. at 95. The undisputed facts of the case included that the president and major shareholder of Joe’s Ready Mix oversaw all operations of the plant, including selecting the site and how and when the plant would be built and operated. Id. at 101. The court cited Griggs, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585, and N. Transp. Co. of Ohio v. City of Chicago, 99 U.S. 635, 642, 25 L.Ed. 336 (1878), for what it termed the consequential damages rule. Id. at 100. The rule is the same as the “natural, probable consequence test,” which provides that “in the exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision.” Harms, 702 N.W.2d at 100 (quoting N. Transp. Co. of Ohio, 99 U.S. at 642, 25 L.Ed. 336). The court noted that Griggs employed the same “natural, probable consequence test” used in N. Transp. Co. of Ohio, which requires that the government action be the cause-in-fact of the damage “as opposed to an indirect or consequential, appropriation or seizure of property.” Id. (quoting N. Transp. Co of Ohio, 99 U.S. at 642, 25 L.Ed. 336) (citing Barbian v. Panagis, 694 F.2d 476, 485-87 (7thCir.1982); Hansen, 65 Fed.Cl. at 102-06). The court held that the actions of Joe’s Ready Mix resulted in the damage to the homeowners’ property rights by creating a nuisance, and therefore there was no taking by the City of Sibley when it rezoned the property in question. Id. at 101. Instead, the homeowners were permitted to recover damages in nuisance from Joe’s Ready Mix. Id.
[¶ 61.] While we have never had occasion to consider the “natural, probable consequence test” in the context of a regulatory takings claim, we are persuaded that the eause-in-fact of the harm must be examined when analyzing the nature or character of the government action that is alleged to have worked a taking. See Hansen, 65 Fed.Cl. at 102-06 (discussing *155 the concept of consequential harm in tort law and its application in takings claims). In doing so, we must identify the specific harm to property incurred by Landowners, and whether the actions that caused the harm were those of the State or some other entity or person not under the direct authority or control of the State. •
[¶ 62.] The damage complained of by Landowners is the intrusion of shot onto their land and over the airspace above their land, as directed by hunters who shoot game birds that have taken flight from the rights-of-way. Landowners argue that the actions of the huriters have been caused by the enactment of SDCL 41 — 9—1.1 (2).[12] The specific conduct complained of by Landowners in their affidavit includes the following:
17. We observed numerous hunters shooting onto our property from [public highways] throughout the four to five weeks [following the opening of hunting season],
18. This season, after the change in road hunting law implementing SDCL 41-9-1.1(2), the behavior of those hunting from the roads has been' bolder and more aggressive.
19. We observed some hunters shooting at pheasants on or above our property that had not taken flight from or crossed the road.
20. We observed hunters shooting within the 660-foot safety zone provided by SDCL 41-9-1.1, including within 660 feet of our home, buildings, and cattle.
*156 21. We observed hunters trespassing on our land and, when confronted, they ordered us off of our own property.
[¶ 63.] The “damage” to Landowners’ property, that is the intrusion of shot onto their lands and shot left on their lands, is caused by the actions of hunters. However, the statute does not specifically encourage or mandate that road hunting be conducted in a manner that causes shots to be fired onto Landowners’ property. The hunters at all times retain control over when, where and how they will fire at game birds flying over the right-of-way. Any damage caused to private property by the actions of hunters cannot be attributed to the State. The State does not place the hunter in the right-of-way or pull the trigger. Instead, any damage to property is attributable only to the acts of the hunters themselves as was the ease for Joe’s Ready Mix in Harms v. City of Sibley. The holding in Griggs supports this proposition as it is the hunters, like the county of Alleghany, that took action in compliance with all pertinent regulations yet was the direct cause of any harm to Landowners’ property. Thus, any harm complained of by Landowners was not legally caused by the legislative enactment, but rather by the particular conduct of the hunters.[13]
[¶ 64.] Furthermore, while SDCL 41-9-1.1(2) decriminalizes the shooting at small game birds originating from or taking flight over a right-of-way, when read in *157 conjunction with SDCL 41-9-8 and 41-9-9, landowners retain all civil remedies against hunters that physically enter and shoot over their land.[14] SDCL 41-9-1.1(2) describes the manner in which game may be taken without violating the criminal law of the State of South Dakota and incurring prosecution for a Class 2 Misdemeanor. The enactment of SDCL 41-9-1.1(2) decriminalizes the conduct for which the defendant was convicted in Rumpca, 2002 SD 124, 652 N.W.2d 795. It does not, however, eliminate any civil remedies available to landowners when a hunter engages in conduct that amounts to a civil trespass.
[¶ 65.] This type of legislative action is not unprecedented. We have in many instances . recognized that the Legislature has the statutory authority to decriminalize an act while retaining civil. liability upon the person who commits the act. The writing of an insufficient funds check in South Dajcota can lead to criminal .prosecution under SDCL 22-41-1 and civil liability under SDCL 22-2-1. Yet, since 1973, the Legislature has seen fit to preclude criminal liability of the perpetrator in numerous instances: i.e., post-dated checks under SDCL 22-41-2.2, failure of victim to serve notice of dishonor upon writer of insufficient funds check per SDCL 22-41-3.1, and failure to prosecute within six months of notice of check’s dishonor as required by SDCL -22-41-3.4. However, should the victim fail to comply with these analogous requirements that preclude a criminal prosecution, he or she still retains full civil remedies under SDCL 22-2-1.
[¶ 66.] Another example is marital relations. South Dakota at one time made adultery a crime. See SDCL 22-22-17 and -18 (repealed by SL 1976, ch 158, § 22-8). These statutes were repealed in 1976. Yet, since 1877 we have also recognized a civil cause of action for alienation of affections. • SDCL 20-9-7. In Veeder v. Kennedy, 1999 SD 23, 589 N.W.2d 610, we upheld the continued civil cause of action as its statutory basis was still in force despite the fact the criminal liability had long since been repealed.
[¶ 67.] The Legislature has also done the reverse. In the passage of SDCL' 35-4-78, it made the sale of an alcoholic beverage to a person under the age of twenty-one a crime yet also stated there would be no civil liability against the seller for the same act. In Wegleitner, 1998 SD 88, 582 N.W.2d 688, we upheld this statutory distinction from dual constitutional, attacks under the separation of powers and the open courts provision in article VI,-section 20 of the South Dakota- Constitution.
[¶ 68.] Here, SDCL 41-9-9 goes one step further in making sure'it is under *158 stood that landowners retain their civil remedies by declaring:
Any person who is engaged, legally or illegally, in hunting is liable for any injury or death to any person or damages to property caused by the hunter’s negligent actions. The injured person or the owner of the property that has been damaged may recover civil damages. Nothing herein shall abrogate any other provision of law.
(emphasis added).
[¶ 69.] The Legislature has also retained criminal statutes that are relevant to this case. Bensons state that they have experienced shot hitting their home and nearby tin shed. Messmers have observed hunters shooting around their home, buildings and cattle. Hunters who engage in such criminal conduct are not protected by SDCL 41-9-1.1(2). Such acts are still a violation of the criminal law under another portion of SDCL 41-9-1.1 that provides in relevant part:
No person, except the adjoining landowner or any person receiving written permission from the adjoining landowner, may use such highways or rights-of-way for the purposes of hunting defined in this title within a six hundred sixty-foot safety zone surrounding an occupied dwelling, a church, schoolhouse or livestock .... A violation of this section is a Class 2 misdemeanor.
[¶ 70.] Next, we have been invited by the Landowners to focus on the perceived “purpose and effect” of SDCL 41-9-1.1(2). Landowners attempt to persuade this Court to focus on the actions of hunters and the records of legislative debates to show that the true purpose and intent of SDCL 41-9-1.1(2) is an expansion of the right-of-way easement created on section lines and public highways to include an easement for hunting on private lands.
[¶ 71.] As we have noted on many occasions:
The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute. The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used. Words and phrases in a statute must be given their plain meaning and effect. When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court’s only function is to declare the meaning of the statute as clearly expressed. Since statutes must be construed according to their intent, the intent must be determined from the statute as a whole, as well as enactments relating to the same subject. But, in construing statutes together it is presumed that the legislature did not intend an absurd or unreasonable result. When the question is which of two enactments the legislature intended to apply to a particular situation, terms of a statute relating to a particular subject will prevail over the general terms of another statute. Moss v. Guttormson, 1996 SD 76, ¶ 10, 551 N.W.2d 14,17 (citing U.S. West Communications, Inc. v. Public Util. Comm’n, 505 N.W.2d 115, 122-23 (S.D.1993)) (citations omitted).
Martinmaas v. Engelmann, 2000 SD 85, ¶ 49, 612 N.W.2d 600, 611.
[¶ 72.] In the instant case, we may not resort to these external resources to interpret the statute, as the words of SDCL 41-9-1.1(2) are “clear, certain and unambiguous.” Again, we are reminded that legislative intent is determined from what the Legislature said, not what we think it said or others think it said. Martinmaas, *159 2000 SD 85 ¶ 49, 612 N.W.2d at 611.[15] To do Otherwise is to engage in a form of judicial legislating, a power that is not granted to us under the constitution and circumvents the role of the Legislature where that power rests. This we cannot and will not do.
[¶ 73.] Despite the lack of tambiguity within SDCL 41-9-1.1(2), Landowners next point to a theoretical situation that might result when landowners attempt to press civil charges against a hunter who fires onto their .property at a game bird that has taken flight from the right-of-way. Landowners hypothesize th'at the-.hunter will be able to use SDCL 41-9-1.1(2) as a defense against a claim of civil trespass, as the conduct has been “legalized” by the statute. However, as noted above, the fact that an act is not a crime does not immunize it from civil liability. 'If this were so, an individual sued for alienation of affection under SDCL 20-9-7 could simply plead as a defense that adultery is no longer a criminal offense in South Dakota. While the statement that adultery is not a crime under South Dakota law is true, it does not preclude a spouse from suing a third party for alienation of affection. See Veeder, 1999 SD 23, 589 N.W.2d 610. The criminality of adultery is not determinative of the civil remedy when the rights of personal relation are infringed upon by the “enticement of a husband from his wife or of a parent from a child.” See SDCL 20-9-7.
[¶ 74.] Similarly, the elements of the tort of civil trespass remain unaffected by SDCL 41-9-1.1(2), and require only that:
One who intentionally and without a consensual or other privilege
(a) enters land in possession of another ■ or any part thereof or causes a thing or third person so to do, or
(b) remains thereon is liable as a trespasser to the other irrespective of whether harm is théreby caused to any of his legally protected interests.
Rumpca, 2002 SD 124, ¶ 10 nl 2, 652 N.W.2d at 798 (citing Restatement (Second) of Torts §' 158). The language used to decriminalize the formerly proscribed conduct does not serve to create civil consent, a civil privilege, or a civil defense for game bird hunters during hunting season, or any other time of the year.
2. & 3. Economic Impact of Regulation on Claimants and Interference with Distinct Investment Backed Expectations
[¶ 75.] Under the second and third factors in Penn Central, Landowners advance only two specific complaints 'with' regard to the adverse economic impact and interference with distinct investment-backed expectations they have incurred as a result of the passage-of SDCL 41-9-1.1(2). According to the complaint, Landowners allege that “SDCL 41-9-1.1(2) denies them valuable hunting and fishing rights appurtenant to and separable from their proper *160 ty as provided by” SDCL 43-13-1 and 43-13-2.[16] Messmers support the claim of adverse economic impact by stating: “Because road hunting, as recently redefined by SDCL 41-9-1.1(2), now includes the shooting of pheasants on or above our land, members of the public shoot onto our property at the expense of the quality of our private hunting business and the income we derive from that business.”
[¶ 76.] However, it is critical to note, that per the provisions of SDCL 41-1-2,
No person shall at any time or in any manner acquire any property in, or subject to his dominion or control, any game bird, game animal, or game fish, or any part thereof, but they shall always and under all circumstances be and remain the property of the state, except as provided by § 41-1-3.
Thus, the only manner in which a person may obtain personal property rights in a wild game bird, animal or fish, is by the lawful taking of the game in compliance with all pertinent hunting and fishing laws. SDCL 41-1-2. Landowners have no property rights in the game that takes refuge, or otherwise locates on their property, until such time as the landowners take the game in compliance with all pertinent hunting regulations. Reis, 1996 SD 75, ¶29, 550 N.W.2d at-84 (Gilbertson, J., concurring).
[¶ 77.] The United States Supreme Court has recognized “that government may execute laws or programs that adversely affect recognized economic values.” Penn Central, 438 U.S. at 124, 98 S.Ct. at. 2659, 57 L.Ed.2d 631. A chal-lenged government action that causes economic- harm will not support a takings claim when the action does not interfere with “interests that were sufficiently bound up with the reasonable expectations of the claimant, to constitute ‘property’ for Fifth Amendment purposes.” Id. (citing United States v. Willow River Power Co., 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945) (“interest in high-water level of river for runoff for tailwaters to maintain power head is not property”); United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913) (“no property interest can exist in navigable waters”)) (citations omitted).
[¶ 78.] Landowners argue that SDCL 41-9-1.1(2) interferes with their right to- grant servitudes and easements for hunting under SDCL 43-13-1. Landowners seem-to suggest that the State should be held liable for any decrease in the value of ,such servitudes that accrues due to a decrease in the number of publicly owned game birds that happen to be located upon Landowners’ property.
[¶ 79.] SDCL 41-9-1.1(2) does not limit the right of Landowners to grant such easements and servitudes. While SDCL 41-9-1.1(2) may affect the quantity of game that may be available within the State and particularly on public rights-of-way, the State has the undisputed right to regulate its wildlife as it is property of the State until lawfully taken by a hunter. See SDCL 41-1-2 and -3. The State is the custodian of wildlife, and allocates state resources to GFPs’ efforts to manage *161 game birds that are deemed of public value. SDCL 41-3-1. The State, does not guarantee the quantity and quality of game birds. Nor does it guarantee that those who hunt will actually take sufficient game to satisfy their pecuniary needs or their daily hunting limit. The State cannot be forced by the courts to manage its wildlife in a manner that guarantees sufficient game to maintain, augment or decrease the value of Landowners’ servitudes or easements.' A decrease in value of these servitudes and easements due to a decrease in the publicly owned game bird population in a particular locale is our free market system at work. The State is not a guarantor of property values.
[¶ 80.] In their complaint, Landowners Messmers state they own and operate a private hunting lodge and maintain private hunting grounds on their property. Mess-mers note they have devoted sixty-five acres of the 3,000 acres of land they farm exclusively to food plots and habitat for pheasants. Messmers also claim that the only income derived from these sixty-five acres of land comes from their private hunting business. Messmers acknowledge that many of their neighbors farm their land differently and do not devote land exclusively for pheasant habitat.
[¶ 81.] When examining the economic impact of the contested regulation and its alleged interference with distinct investment-backed expectations, the court must determine how and to what extent the acts in question have adversely impacted the economic value of the land. Penn Central, 438 U.S. at 130-32, 98 S.Ct. at 2662-63, 57 L.Ed,2d 631. In doing so, the land is viewed as one complete parcel rather than dividing - the “single parcel into discrete segments and attempt[ing] to determine whether rights in a particular segment have been entirely abrogated.” Id. at 130-31, 98 S.Ct. at 2662-63, 57 L.Ed.2d 631. Viewed from this perspective, Landowners retain the full value of the land whether it is devoted to pheasant habitat or conventional farming.
[¶ 82.] The enactment of SDCL 41-9-1.1(2) does not prohibit Landowners from devoting any portion of their land to pheasant habitat or other income producing venture. But' as noted above, the State is not a guarantor of the game bird population in a particular locale. Therefore, a takings claim that relies on a decrease in profitability of a privately owned business due to the taking of publicly owned birds by road hunters must fail under this portion of the balancing analysis.
[¶ 83.] Finally, even if Landown-efs were able to establish economic losses or a bona fide injury to distinct investment-backed expectations, a taking by the State would still not have occurred. It is the actions of the hunters that would be the cause of losses, as it is 'the intrusion of shot onto Landowners’ property and shot left on their lands, and not the legislative enactment of SDCL 41-9-1.1(2), that is the legal cause of' any injury incurred by Landowners. 'See supra ¶¶ 61-63.[17]
Conclusion
[¶ 84.] An examination of the history of our hunting statutes in Reis, 1996 SD 75, ¶¶ 28-31, 550 N.W.2d at 84-85, (Gilbert-son, J., concurring),- shows that for a great part of our history there were no, or only *162 limited, criminal restrictions upon hunting. If the passage of SDCL 41-9-1.1(2) constitutes a compensable taking, then the same legal situation existed from 1889 and for many years thereafter. During those decades there were no criminal penalties for firing at a pheasant that was flying over private land. Yet, one can search all the Constitutional Debates and our case law prior thereto and after 1889 and there is no hint or suggestion a taking was the state of the law. “[T]he Constitution was written and adopted in the light of the conditions and well known laws as they then existed.... ” Wegleitner, 1998 SD 88, ¶ 31, 582 N.W.2d at 698 (citations omitted). Although the hunting statutes have been repeatedly revised and amended since 1899, the relevant portion of article VI, section 13 of our state constitution remains the same as it did when enacted in 1889.
[¶ 85.] Moreover, if these Landowners can successfully advance a takings claim here, any citizen or group thereof who can establish a monetary loss will be looking to the public treasury for compensation should the Legislature deem the cause of action not to be appropriate for criminal sanctions, let alone remove one. Such a rationale was rejected in Wegleitner. “Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.” Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d 631 (quoting Mahon, 260 U.S. at 413, 43 S.Ct. at 159, 67 L.Ed. at 322).
[¶86.] Reduced to its core, Landowners’ argument is that the State faces two options: it must for the first time in its history be compelled by the constitution to declare an act to be in violation of a criminal law or in the alternative pay Landowners for its refusal to do so. Landowners cite no case law to support this argument and we have been unable to find any court which has so held. This argument improperly attempts to shift the resolution of the issue from the legislative arena to that of this Court. While the Legislature certainly enjoys the legal authority to once again make this type of activity criminal in nature, there is nothing in our Constitution to compel it. To hold otherwise would be to rule that compensable takings have been ongoing since 1889, except for that short period of time when the Legislature chose to criminalize the conduct as described in SDCL 41-9-1.1(2).
Although many members of the Constitutional convention were to become Legislators in the new State of South Dakota, the early State Legislatures felt no constitutional compulsion to strike down or even modify [the unlimited right to hunt]. Green [v. Siegel, Barnett, & Schutz ], 1996 SD 146, ¶ 18, 557 N.W.2d [396,] 402.
Wegleitner, 1998 SD 88, ¶ 11 n. 3, 582 N.W.2d at 692.
[¶ 87.] Furthermore, any civil remedies that existed prior to the passage of SDCL 41-9-1.1(2) remain intact. In fact, Landowners cite to no legislative roll-back of any civil causes of action that have existed for the protection of their property rights. At all times immediately prior to, and after this Court’s holding in Rumpca, 2002 SD 124, 652 N.W.2d 795, and the legislative reaction to it by the amendment of SDCL 41-9-1.1(2), landowners’ civil remedies against hunters remained the same.
[¶ 88.] Were we to affirm the circuit court and conclude a compensable taking has occurred here, the question would then arise as to what property rights the State has acquired by its inverse condemnation and compensation payments to the Landowners, for this “is ultimately a judicial question.” See Illinois Central R.R. Co., 33 S.D. at 77, 144 N.W. at 728 (quoting Hairston v. Danville & WR Co., 208 U.S. *163 598, 28 S.Ct. 331, 52 L.Ed. 637 (1908)). Although SDCL 41-9-1.1(2) is explicitly restrictive, the constitution that mandates the compensation requirement for a taking also guarantees “public use” in exchange. Under the “use by the public” doctrine as set forth in Illinois Central, we would have to decide whether the public now has purchased and enjoys the right to enter and hunt in the affected realty, not just shoot over it. See also Frawley Ranches, 270 N.W.2d at 369. “The right-of-way is public if everyone who desires may lawfully use the right-of-way.” Id. at 369. This is a theoretical question which need not be answered, as we hold there is no compen-sable taking to begin with under the facts of this case.
[¶ 89.] “While the wisdom of the current statutes may be justly debatable, there is nothing contained in [the constitution] to topple them.” Wegleitner, 1998 SD 88, ¶ 35, 582 N.W.2d at 699. For the above reasons we reverse the holding of the circuit court on Issue 3.
[¶ 90.] ZINTER, Justice, and JOHNSON, Circuit Judge, concur.
[¶ 91.] KONENKAMP, Justice, concurs in result.
[¶ 92.] MEIERHENRY, Justice, dissents.

. This Court has also recognized the causal connection element of standing. "[SJtanding is satisfied if the litigant can show 'that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the Defendant.’ ” Edgemont Sch. Dist. 23-1 v. South Dakota Dep’t of Revenue, 1999 SD 48, ¶ 16, 593 N.W.2d 36, 40 (quoting Agar Sch. Dist. No. 58-1 v. McGee, 527 N.W.2d 282, 284 (S.D.1995) (citing Parsons, 504 N.W.2d 593, 595 (quoting Gladstone, Realtors, 441 U.S. at 99, 99 S.Ct. at 1608, 60 L.Ed.2d at 76))) (emphasis added).

. Although I would address Landowners’ taking claim as a part of the standing issue, I fully concur in the Court's takings analysis in Issue 3.

. The Landowners' claim is really about damage to real property, not an outright permanent taking. Article VI, section 13 of the South Dakota Constitution also provides com- . pensation for damage to private property which is not permissible under the law. Originally this "damage” provision was not part of our proposed State Bill of Rights but rather the 1883 Constitutional Convention adopted the language of the Federal Constitution. See Constitution Convention of 1883, South Dakota Historical Collections, vol. XXI, 342 (State Historical Society, 1942). However, the 1885 Constitutional Convention, after some debate, included the term "damage." Constitutional Debates of South Dakota, vol. 1, at 292-299. This "damage” clause would ultimately be adopted by the 1889 Constitutional Convention and become part of our South Dakota Constitution. Constitutional Debates of South Dakota, vol. 2 at 133. See also Richards v. Washington Terminal Co., 233 U.S. 546, 554, 34 S.Ct. 654, 657, 58 L.Ed. 1088 (1914).

. The original regulation of 1899 criminalized the act of taking game from private lands if hunters "knowingly hunted on enclosed, occupied, or cultivated lands of another without the consent of the owner or tenant[.]" Rev SD Political Code § 3054 (1903) (codified as SDCL 41-9-1). The 1899 law was amended to provide for posting of private lands. SL *148 1909, ch 240, § 25. Under this law, a person could hunt almost anywhere unless the land was posted "NO HUNTING” in the English language in conspicuous places. To the extent that growing or standing grain fields were involved, permission was required from the landowner. Id. In 1919 the law was amended so as to provide that permission was required on all cultivated lands, not just grain fields. SL 1919, ch 216, § 10511. The,law was again amended in 1925 so as to delete the requirement of cultivated lands. SL 1925, ch 175, § 10511. Posting was required for all lands as of 1925. Id. In 1929, the Legislature amended the statutes to require permission of the landowner if the land was enclosed with a woven wire fence. SL 1929, ch 136, § 10511. SDCL 41-9-1 and 41-9-1.1 trace their roots to 1947 when the Legislature passed the following statute:
Farm land protected. No person shall enter upon any land not his own or in his possession, which is fenced with woven wire, or land upon which there is farm livestock, or land, upon which there is unharvested grain, or land which is within forty rods of occupied farm buildings or schoolhouse without permission from the owner or lessee of such nor shall any person enter upon any land or lands not his own or in his possession with intent to take or kill any bird or animal, after being notified by the owner or lessee not to do so. Such notice may be given orally or by post-mg written or printed notices to that effect in the English language not more than eighty rods apart, in conspicuous places around the land so protected. This section shall be printed on all hunting licenses.
SL 1947, ch 112, § 1.
This subject matter has obviously continued to be one of great concern for the Legislature as it has revisited this statute with amendments in 1949, 1951, 1953, 1955, 1964, 1967, 1968, 1972, 1973, 1981, 1988, 1992, 1996 and 2003. See SL 1949, ch 94; SL-1951, ch 121; SL 1953, ch 107; SL 1955, ch 83; SL 1964, ch 79; SL 1967, ch 86; SL 1968, ch 100; SL 1972, ch 225; SL 1973, ch 269, § 1-2; SL 1974, ch 278; SL 1981, ch 299, § 1, § 4; SL 1988, ch 337; SL 1991, ch 337, § 62; SL 1992, ch 293,. § 13; SL 1996, ch 252, § 1; SL 2003, ch 225, § 1.

. ' Landowners go to great lengths to characterize their claims as something other than an objection to the Legislature’s decriminalization of this one aspect of "road hunting.” However, the true nature of their claim is revealed by all parties’ agreement (including the circuit court's decision) that SDCL 41-9-1.1(2) was enacted in response to State v. Rumpca, 2002 SD 124, 652 N.W.2d 795, a case upholding Rumpca’s criminal trespass conviction for shooting from a right-of-way at a bird flying over private land. Despite the true nature of Landowners’ claim, the merits of their takings claim must be addressed. However, outside of that, Landowners’ argu *149 ments as to the decriminalization cannot be addressed due to their lack of standing. Landowners have no standing because the United States Supreme Court has made it unequivocally clear that even though a person may suffer injury from a lack of prosecution, given the "special status of criminal prosecutions in our system,” that person has no standing to challenge the failure to prosecute any particular criminal offense. Linda R.S., 410 U.S. at 619, 93 S.Ct. at 1149, 35 L.Ed.2d 536. That is because “in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.” Id. See also Leeke v. Timmerman, 454 U.S. 83, 85-87, 102 S.Ct. 69, 70-71, 70 L.Ed.2d 65 (1982) (citing Linda R.S., 410 U.S. at 619, 93 S.Ct. at 1149, 35 L.Ed.2d 536) (prison inmates lacked standing to challenge actions of correctional facility officials who influenced prosecutor to oppose issuance of arrest warrant for correctional officers accused of unnecessarily beating inmates).

. The permanent physical occupation in Lor-etto consisted of the "direct physical attachment of plates, boxes, wires, bolts, and screws to the building, completely occupying space immediately above and upon the roof and along the building’s exterior wall." 458 U.S. at 438, 102 S.Ct. at 3177, 73 L.Ed.2d 868.

. The United States government had planned to construct a twelve-gun heavy artillery or battery on the land in 1873. Peabody v. United States, 231 U.S. 530, 536, 34 S.Ct. 159, 159-60, 58 L.Ed. 351 (1913). However, the battery eventually consisted of three ten-inch cannons and two three-inch rapid fire guns by the time Peabody was heard in 1913. Id. See also Portsmouth Harbor Land & Hotel Co. v. United States, 250 U.S. 1, 39 S.Ct. 399, 63 L.Ed. 809 (1919) (Portsmouth I). By the time Portsmouth II was filed, the old cannons had been dismantled and the government had erected heavy cannons at the fort as part of the nation's World War I coastal defense system. Portsmouth II, 260 U.S. at 335-36, 43 S.Ct. at 139, 67 L.Ed. 287 (Brandéis, J., dissenting).

. The Court found that the hotel on the property had previously been profitable, but was conducted at a loss in 1903 and 1904 after the installation of the cannons. Peabody, 231 U.S. at 538, 34 S.Ct. at 160, 58 L.Ed. 351. "[S]ince 1904, it had been closed and the cottages had been rented only in part and at reduced rates.” Id.

. Landowners’ reliance on Citizens for a Safe Grant v. Lone Oak Sportsmen's Club, Inc., 624 N.W.2d 796 (Minn.App.2001), and State v. Wilkinson, 724 So.2d 614 (Fla.Dist.Ct.App. 1998), is also misplaced. Landowners cite these cases as support for the proposition that shots fired over private property, while intermittent, constitute trespass or invasion of the Landowners’ property interest and that such an invasion constitutes a taking within the meaning of Loretto. However, in Citizens for a Safe Grant, the court held that shots fired over plaintiffs’ private property constituted "unlawful entry” by the defendant such that the circuit court did not err when it found the defendant committed the tort of civil trespass. 624 N.W.2d at 805. In Wilkinson, the appellate court upheld a criminal conviction for third-degree felony trespass as defined by statute. 724 So2d at 615. The defendant in that case fired a rifle over private property in an effort to illegally shoot and kill a deer, an offense defined by statute as third-degree criminal trespass. Id. Neither case stands for the proposition that intermittent shooting over private property is of such a magnitude and frequency as to work a taking within the meaning of Loretto.

.SDCL 41-9-1.1(2) pertains only to small game, and specifically to small game that is able to take flight. SDCL 41-1-1(24) defines small game as:
"Small game,” anatidae, commonly known as swans, geese, brants, merganser, and river and sea ducks; the rallidae, commonly known as rails, coots, and gallinule; the limicolae, referring specifically to shore birds, plover, snipe, and woodcock; the gruidae, commonly known as sandhill crane; the columbidae, commonly known as the mourning dove; the gallinae, com *152 monly known as grouse, prairie chickens, pheasants, partridges, and quail but does not include wild turkeys; cottontail rabbit; and fox, grey and red squirrel. The term includes facsimiles of small game used for law enforcement purposes[.]
SDCL 41-9-1.1(2) seems to apply to pheasants, grouse, partridge, quail and various waterfowl, but excludes mourning dove. http://www.sdglp.info/Wildlife/hunting/In-'dex.htm (last visited January 23, 2006). According to GFP, the hunting season for these small game birds runs for specified periods of time beginning the third Saturday in September until the fourth week of January, depending on the type of bird and for some types of birds depending on zone location. http://www.sdgfp.info/Wildlife /hunting/Info/SGSeasons.htm (last visited January 23, 2006).

. SDCL 41-9-1.1, which defines the parameters of criminal trespass while road hunting, provides:
Except for controlled access facilities as defined in § 31-8-1, interstate highways, unimproved section lines not commonly used as public rights-of-way, and highways within parks or recreation areas or within or adjoining public shooting areas or game refuges posted for restriction of an applicable use as hereinafter set forth by the Department of Game, Fish and Parks, § 41-9-1 does not apply to fishing, trapping, or hunting on highways or other public rights-of-way within this state that meet the requirements of § 41-9-1.3. For purposes of this section, hunting on highways or other public rights-of-way includes:
(1) The shooting at or taking by legal methods of small game, except mourning dove, that are located within the boundaries of the highway or public right-of-way;
(2) The shooting at or taking by legal methods of small game, except mourning dove, that are in flight over private land if the small game has either originated from or has taken flight from the highway or public right-of-way or if the small game is in the process of flying over the highway or public right-of-way.
If subdivision (2) of this section is declared by an advisory opinion or adjudication of the South Dakota Supreme Court to be a taking of private property requiring compensation, subdivision (2) is void.
No person, except the adjoining landowner or any person receiving written permission from the adjoining landowner, may use such highways or rights-of-way for the purposes of hunting defined in this title within a six hundred sixty-foot safety zone surrounding an occupied dwelling, a church, schoolhouse, or livestock. Neither the person discharging a firearm at small game nor the small game being shot at may be •within the safety zone. No person, except the adjoining landowner or any person receiving written permission from the adjoining landowner, may use such highways or rights-of-way for the purpose of trapping within six hundred sixty feet of an occupied dwelling, church, or schoolhouse. A violation of this section is a Class 2 misdemean- or. If any person is convicted of knowingly discharging a firearm within six hundred sixty feet of any occupied dwelling, church, or schoolhouse for which such distance has been clearly and accurately marked and posted, the court shall, in addition to any other penalty, revoke the person’s hunting privileges for a period of one year from the date of conviction.

. The circuit court, however, accepted the Landowners' argument that the enactment of SDCL 41-9-1.1(2) was not merely a decriminalization of the act of firing onto private property while road hunting, but rather, based on the 2003 Hunting Handbook of the South Dakota GFP, constituted a compensa-ble taking. In doing so, the circuit court was both legally and factually incorrect.
The 2003 Hunting Handbook is simply a guide to hunters published by GFP. It does not purport to enact law as it notes in its opening page, "The Hunting Handbook is a synopsis of South Dakota Codified Laws and Game and Fish and Parks rules.” State of South Dakota, Hunting Handbook 5 (2003). What actually constitutes the law in this state is set forth in SDCL 1-1-23, which provides: The will of the sovereign power is expressed:
(1) By the Constitution of the United States;
(2) By treaties made under the authority of the United States;
(3) By statutes enacted by the Congress of the United States;
(4) By the Constitution of this state;
(5) By statutes enacted by the Legislature;
(6) By statutes enacted by vote of the voters;
(7) By the ordinances of authorized subordinate bodies;
(8) Rules of practice and procedure prescribed by courts or adopted by departments, commissions, boards, officers of the state, or its subdivisions pursuant to authority so to do.
SDCL 1-1-23 does not include such “synopses” or handbooks.
Factually the handbook section on "Hunting on Public Road Rights-of-Way” nowhere mentions that a hunter has the full legal right to fire over private property. State of South Dakota, Hunting Handbook 26 (2003). In fact at page forty, the handbook informs the landowner "How to Prosecute a Trespasser.” Id. at 40. The phrase relied upon by the circuit court, "[t]o be lawfully taken from a public road right-of-way, the hunter must be within the right-of-way boundaries when shooting, and the game must originate from or be flying over the road right-of-way” is found in the section dealing with "Unarmed Retrieval” not "Road Hunting.” Id. at 33. However, Landowners have not challenged the status of unarmed retrieval of birds shot over the right-of-way, which is the subject of that particular sentence.
Neither has the Legislature seen fit to delegate sole regulatory authority over section line highways to GFP. The construction, repair and maintenance of these roads are the responsibility of the board of township supervisors. SDCL 31-13-1. Relocation or vacation of a section-line highway is granted to the county commissioners or the board of supervisors of an organized township under appropriate circumstances. SDCL 31-18-3.

. In its amici brief, the South Dakota Wildlife Federation sets forth whát it believed to be a catalogue of those civil remedies. It stated: ,,
Here, the Plaintiffs retain their right to bring an action in Ejectment, SDCL 21-3-6, the traditional method for redeeming property interests against interlopers. This action may be for damages as well as for recovery of title. Where force is used, ,a plaintiff in Ejectment may recover treble damages. SDCL 15-3-1. The common law action of Private Nuisance is available to protect Plaintiffs in their use and enjoyment of property. SDCL 21-10-1, -3. Plaintiffs also retain the right to protect their property through Trespass both as a civil tort, and as a misdemeanor, SDCL 22-35-6. Injunction is available in appropriate cases. SDCL 2L — 8—1. In other.words, all classical common law and statutory remedies for assertion of rights in private property remain intact. That being so, the essential element of all takings jurisprudence is lacking in this case-an action by government which deprives landowners of title.
Amicus Curiae South Dakota Wildlife Federation’s Br. 3.

. Landowners cite two statements made during the floor debate of SDCL 41-9-1.1(2) for the proposition that it was intended to go beyond decriminalization and was in reality intended-to-strip landowners of any remedy for firing at game flying over their land. We have consistently held that statements of individual legislators are not persuasive to establish the intent of the Legislature for a particular statute. Cummings v. Mickelson, 495 N.W.2d 493, 499 n. 7 (S.D. 1993) (citing State ex rel. Cooperative Wool Growers v. Bushfield, 69 S.D. 172, 176, 8 N.W.2d 1, 3 (1943)). There are 105 legislators and there may be 105 different individual reasons they vote for -or against a bill. Rather, our rule of construction is that the Legislature said what it meant and meant what it said from the text of the statute. In re Famous Brands, Inc., 347 N.W.2d 882, 885 (S.D.1984).

. SDCL 43-13-1 provides in relevant part:
The following land burdens, or servitudes upon land, may be granted and held, though not attached to land:
(1) The right to pasture, and of fishing and taking game[.]
SDCL 43-13-2 provides in relevant part:
The following land burdens or servitudes upon land may be attached to other land as incidents or appurtenances, and are called easements:
(3) The right of taking game[J

. Landowners’ complaint does not allege- a direct violation of the Privileges and Immunities Clause. However, any claim by Landowners that the State has deprived them of "rights, privileges or immunities secured by the Constitution and laws and [defendants] are liable therefore under 42 USC 1983,’’ is a part of their central claim of an uncompensated taking. Because we hold no taking exists, all such subsidiary claims also fail.